PEOPLE v. DETROIT CITIZENS' STREET-RAILWAY CO.

1. MUNICIPAL CORPORATIONS—PENAL ORDINANCES—COURTS.

The authority to prescribe penalties for violations of city ordi-
nances, conferred upon the common council of Detroit by
section 257 of the charter of 1893, is not limited to such ordi-
nances as are adopted under the police power of the council,
but includes those that may be enacted by virtue of contract
relations existing between the city and the owner of a public
franchise, and, under section 249, the recorder's court of said
city has jurisdiction over a prosecution for a violation of
*any* ordinance of the city.

2 STREET RAILWAYS—CAR SERVICE—ORDINANCES—CONSTRUCTION.

By ordinance passed in 1862, when street railroading was
in its experimental stage, the common council of a city of
50,000 inhabitants granted to a street-railway company a
30-year franchise. Among other provisions, the ordinance
prescribed that cars should be drawn by animals only, at a
speed not exceeding six miles per hour, and should be run
as often as public convenience should require and the council
should direct, provided that the council should not require
the running of cars oftener than once in 20 minutes dur-
ing 14 hours in the day for part of the year, and 12 hours
in the day for the rest of the year. In 1879, the city having
in the meantime doubled in population, a new ordinance
was adopted, and accepted by the company, extending the
franchise for 30 years, and providing merely, with reference
to car service, that the cars on all lines should be operated
"as the public convenience may require and the common
council order." It was further provided that all ordinances
or parts of ordinances not in conflict therewith should con-
tinue in force. *Held*, that the limitation upon the authority
of the council with respect to the service of cars, contained
in the earlier ordinance, was abrogated by the later one.

3. SAME—PUBLIC OFFICERS—PRESUMPTION OF GOOD FAITH.

It will not be presumed that the members of a city coun-
cil were actuated by improper motives in the passage of an
ordinance prescribing the frequency with which street cars
should be run, but, on the contrary. it will be presumed that
such action was taken in the exercise of a judgment based
upon an acquaintance with all the facts; and such judgment,
as embodied in the ordinance, will control the courts, upon
inquiry as to the reasonableness of such ordinance, unless it
clearly appears that it was improperly exercised.

4. Same—Reasonableness of Ordinance—Evidence.

    A city ordinance requiring a street-railway company to run its cars every six minutes on a specified street will not be held unreasonable, where no trial has been made of its provisions, upon a showing merely that the average number of passengers to a car, under the existing 12-minute service, is between seven and eight only.

 *Certiorari* to recorder's court of Detroit; Chapin, J. Submitted October 13, 1897.   Decided March 15, 1898.

The Detroit Citizens' Street-Railway Company, a corporation, and Jere C. Hutchins, its vice-president and treasurer, were convicted of violating an ordinance of the city of Detroit respecting the service of cars.   Conviction affirmed.

*Brennan, Donnelly & Van De Mark* and *Bernard B. Selling*, for appellants.

*C. D. Joslyn*, for the people.

Moore, J.   Mr. Hutchins is vice-president and treasurer of the Detroit Citizens' Street-Railway Company, a corporation operating a line of street railways in the city of Detroit.   In February, 1897, the common council of the city adopted an ordinance requiring the street-railway company to "provide sufficient cars upon Gratiot avenue so that a six-minute service shall be given upon said avenue between Mack and Sheridan avenues between the hours of 5:30 a. m. and 10 p. m."   Section 3 of the ordinance reads as follows:

"Sec. 3. Any violation or failure to comply with the provisions and requirements of this ordinance shall be punished by a fine of not to exceed $300; and said fine, when so imposed, may be recovered from the person or corporation so convicted in an action of law, in the proper court."

The company did not comply with the terms of this ordinance.   A complaint was made in the recorder's court for the city of Detroit against Mr. Hutchins, as

vice-president and treasurer, and the railway company. They were convicted under the direction of the court, and a writ of *certiorari* has been issued to review the proceeding here.

To discuss the questions involved intelligently, it is necessary to make quite a complete statement of what is shown in the record. In 1862 a number of gentlemen proposed to organize a corporation under the provisions of "An act to provide for the construction of train railways" (Act No. 148, Laws 1855). The common council passed an ordinance, which was approved November 24, 1862, granting to them a franchise to operate a railway in certain streets in the city of Detroit. The ordinance contained these provisions:

"Sec. 7. The cars to be used on said railways shall be drawn *by animals only*, at a *speed not exceeding* the rate of *six miles per hour, and shall be run as often* as public convenience shall require and the common council shall prescribe: *Provided always*, that said council will not require them to run regular *cars oftener than once in twenty minutes during fourteen hours* every day from the fifteenth day of April to the fifteenth day of October, and twelve hours every day from the fifteenth day of October to the fifteenth day of April. * * *

"Sec. 19. It is hereby reserved to the common council of the city of Detroit the right to make such further rules, orders, or regulations as may from time to time be deemed necessary to protect the interest, safety, welfare, or *accommodation of the public* in relation to said railways.

"Sec. 20. The powers and privileges conferred by the provisions of this ordinance shall be limited to thirty years from and after the date of its passage."

In November, 1879, an ordinance was adopted by the council containing, among others, the following provisions:

"Sec. 4. On the first of July and January in each half year from the first of January, 1880, the Detroit City Railway Company shall pay to the treasurer of the city of Detroit a tax of one per cent. during the period of this ordinance, on the gross receipts of the several lines of street railway operated by said company. * * *

The foregoing special tax and undertaking as to paving shall be in lieu of license and other taxes and charges for paving under existing ordinances. And it is hereby stipulated and agreed that the cars on all lines subject to this ordinance shall be operated as the public convenience may require and the common council order.

"Sec. 5. The powers and privileges conferred and obligations imposed on the Detroit City Railway Company by the ordinance passed November 24, 1862, and the amendments thereto, are hereby extended and limited to thirty years from this date. * * *

"Sec. 6. This ordinance shall take immediate effect when written acceptance of the terms thereof is filed in the office of the city clerk of Detroit by the Detroit City Railway Company, the Detroit & Grand Trunk Junction Street-Railway Company, and the Central Market, Cass Avenue & Third Street Railway Company, or their successors; and from that date all ordinances, or parts of ordinances, in conflict with the provisions hereof, shall stand repealed; and all ordinances and parts of ordinances not in conflict herewith are hereby affirmed and continued in force."

It is by virtue of the ordinances mentioned that the street-railway company is operating its line of road today.

On the trial it was shown on the part of the railway that the Michigan-Gratiot line of its system runs from the end of Michigan avenue, across the city, out Gratiot avenue. Upon this track, from Trumbull avenue to Chene street, the Trumbull-Chene street line also runs; so that from the intersection of Trumbull and Michigan avenues to the intersection of Chene street and Gratiot avenue there is a double service on the line. On both the Trumbull-Chene and the Michigan-Gratiot lines is a six-minute service, so that from Trumbull avenue to Chene street the cars run every three minutes. After the Chene-street cars leave the Gratiot-avenue track, from that point out there is again a six-minute service on the Michigan-Gratiot line, which six-minute service continues as far as Mack avenue. From that point, one-half of the cars of the Gratiot-avenue line go out Mack avenue, and the other half continue out Gratiot avenue as far as the loop, which is a

little beyond Sheridan avenue. This gives a 12-minute service on Mack avenue, and also a 12-minute service on Gratiot avenue from Mack to Sheridan avenues. From 5:30 to 7 a. m., and from 5:15 to 6:15 p. m., cars are run every six minutes on Gratiot avenue from Mack to Sheridan, and cars from Mt. Clemens, run by the Rapid Railway, come down and go up Gratiot avenue every 30 minutes. It is the claim of the railway company that there is not sufficient travel beyond the junction of Mack and Gratiot avenues to make it necessary to put on cars more frequently than they now run them. They also claim that to give the service required by the ordinance of 1897 would involve an annual expenditure of about $50,000. It is the claim of the people that, in view of the settled condition of that part of Detroit beyond the junction of Mack and Gratiot avenues, there is need of a six-minute service to comply with the reasonable demands of the public; that the six-minute service would not be nearly as expensive as claimed by the railway company; that some of the cars could be run out Mack avenue, and return only to Gratiot; and that, even if it was expensive, the cost would not be a reason why they should not comply with the ordinance. Proof was introduced on the part of the respondents to the effect that during a portion of March, after the ordinance went into effect, they caused the number of passengers carried by their cars on Gratiot avenue, at a point just beyond the junction with Mack avenue, to be counted, and the average was a trifle more than 7 persons to the car during the 12-minute service, and 13 during the 6-minute service. To get this average, the car service both ways was included.

Counsel for respondents in their brief say:

"There are practically but three questions in this case: * * * (1) Has the common council of the city of Detroit the power, under its police regulations, to pass the ordinance upon which the complaint is based? (2) Has the common council the power to pass this ordinance under its contract with the railway company? (3) Is the ordinance reasonable?"

In our view of the law, it will not be necessary to discuss at length the first question. It is claimed that, unless the ordinance is passed by virtue of the police power of the council, the recorder's court has no jurisdiction. It may be well to say that if, under the contract relations existing between the city and the company, the former had the right to pass the ordinance of 1897, the common council had a right to provide a penalty for its violation. This right is expressly conferred by section 257 of the charter (Charter of Detroit, 1893). Section 249 confers upon the recorder's court authority to try persons charged with violation of the ordinances of the city.

Passing to the second question, it is said by counsel that, under the franchise held by the railway company, the city had no right to pass the ordinance of 1897. It is said that the ordinances of 1862 and 1879 constitute a contract between the city and the street-railway company, and that "the ordinance of 1879 was not a new grant or a new consent; it was confessedly an extension of the old grant of consent, upon the terms and conditions of the old consent, except in so far as those terms were readjusted,"— citing *Detroit Citizens' St. R. Co.* v. *City of Detroit,* 12 C. C. A. 365 (26 L. R. A. 667). It is now urged that as the city agreed, by the provisions of section 7 of the ordinance of 1862, not to require the company "to run regular cars oftener than once in twenty minutes during fourteen hours every day from the fifteenth day of April to the fifteenth day of October, and twelve hours every day from the fifteenth day of October to the fifteenth day of April," by reason of its contract with the company the city cannot now require the company to run cars oftener than once in twenty minutes. All of these provisions in the various ordinances, so far as they appear in the record, relating to the frequency with which cars shall be run, the rate of speed, and the motive power allowed, have already been quoted.

In construing these ordinances, it may be worth while to inquire into the situation when they were passed.

Detroit, in 1862, was a city of about 50,000 people. Its residents all lived within a comparatively short distance of the business center. A street railway was comparatively unknown. It was yet in an experimental stage. No more practical method of furnishing motive power was known than the use of animals. It was believed that a speed not exceeding 6 miles an hour, and cars run not more frequently than 3 times an hour for 14 hours in the day part of the year, and 12 hours a day for the remainder of the year, would answer the convenience and demands of those who were likely to be patrons of the road. The franchise conferred by the ordinance of 1862 would end by its terms in 1892. In 1879 the population of the city was upwards of 100,000 people, and the city was growing rapidly. Street-railway systems were no longer experiments. A franchise like that conferred by the ordinance of 1879, in a city like Detroit, was known to be an exceedingly valuable thing. The ordinance of 1879, by its terms, gave the company a franchise for 30 years. Improved methods of motive power were coming into vogue. Portions of the residence part of the city were much farther from the business center than in 1862. The public demanded quicker and more frequent service then than it had earlier. Is it likely that, under such circumstances, the council would confer a franchise for 30 years over the principal streets of a great and growing city, with a limitation that the city should not require the running of cars oftener than 3 times an hour, and not at all for 10 hours of the day for part of the year, and 12 hours a day for the remaining portion of the year? On the other hand, is it probable that the railway company would be willing to accept an ordinance running for 30 years which limited it to the use of animal power in the transportation of its cars, and to a speed of 6 miles an hour? We think this contention is unreasonable, and that the ordinance of 1879 was given and accepted with the understanding of all parties to it that the provision in section 4 ''that the cars on all lines subject to this ordinance shall be operated as

the public convenience may require and the common council order" should control.

Is the ordinance reasonable? Who shall determine? It is evident that, when the provisions of the ordinance ceased to direct how frequently the cars should run, the parties to the ordinance understood that, in the first instance, the common council should decide. It is urged that the interests of the company and the public are identical, and that the frequency with which the cars shall be run can safely be left to the company. It is sufficient reply to this suggestion to say that the ordinance does not so provide. It is said, in substance, that, if the power is lodged with the common council, the chances are that the public interests would not be subserved, but private spites and hatreds gratified, and that a corrupt common council may sap the life-blood of industries in cities unless the corporations "see" the members of the council. We cannot presume that members of a common council are actuated by improper motives, or that their actions towards corporations are actuated by improper motives. But, if this were conceded, there would be two remedies: *First.* The aid of the criminal law should be invoked to punish alike the members of the council whose official acts are influenced by corrupt means, and the corporation which makes use of the corrupt methods to improperly influence official action. The second remedy is for the people to elect honest members to the common council. It may be assumed, in the very nature of things, that the members of the common council are acquainted with the city, the number and direction of the streets, the density of its population, the need of quick transportation, and how well the need is supplied. They ought to be men, too, who would stand impartially between the people whom they represent and the corporations to whom franchises have been granted, and would respect the rights of both. The common council acts as the public and municipal agent, and, in the passage of an ordinance affecting subjects of municipal administration, it should and will be

presumed that the council acted in the exercise of a judgment upon the facts, and their judgment must control until it has been shown that it has been improperly exercised. *Mayor, etc., of New York* v. *Dry-Dock, etc., R. Co.*, 133 N. Y. 104 (28 Am. St. Rep. 609). We have no doubt, if it was clearly made to appear that the action of the council was capricious and arbitrary, or that the public convenience did not require the provisions contained in the ordinance, that the courts might intervene. It is not made to appear that the action of the common council is unreasonable, especially if stub trains are allowed to be run from the junction of Gratiot and Mack avenues, out Mack avenue, which should be allowed if the company so desires. Until the company has given the provisions of the ordinance a trial, no one can say that they are unreasonable. This the company should be required to do.

The judgment of the court is affirmed, and the case is remanded for further proceedings.

The other Justices concurred.