[No. 22690. *En Banc.* May 14, 1931.]

A. K. WYLDE *et al., Respondents,* v. THE CITY OF
SEATTLE *et al., Appellants.*[1]

*A. C. Van Soelen* and *Charles L. Smith,* for appel-
lants.

*Meier & Meagher,* for respondents.

[1]Reported in 299 Pac. 385.

584

BEALS, J.—During the year 1911, the city of Seattle granted to George W. H. White a franchise authorizing the construction of an electric railway from a point on West Spokane street known as "Riverside," in a general southerly direction, a distance of about five miles, to the city limits; and at approximately the same time, King county granted to Mr. White a franchise authorizing the construction of an electric railway from the southerly boundary of the city of Seattle to a point at or near Lake Burien, approximately four and one-half miles further south. An electric railway was constructed pursuant to these franchises, which, during the year 1913, was being operated by a corporation named Highland Park & Lake Burien Railroad, which corporation had succeeded to Mr. White's interest in the franchises and property.

The railway proving unprofitable, and the operation thereof having ceased, the board of trustees of the corporation above named, August 5, 1913, passed a resolution offering to the city of Seattle, as a free gift, all of the properties of the street railway system, free and clear of all liens or liabilities. During the month of October following, the city council, by ordinance No. 31994, accepted the gift, and January 14, 1914, the corporation, by warranty deed, conveyed the railway to the city of Seattle, which has ever since maintained and operated the same.

At the time the street railway was offered to the city, it was indebted in a considerable amount, and its property encumbered, and, as the city would not accept a gift of the railway until the encumbrances against the same were satisfied, a fund was raised by persons interested in the continued operation of the road, either because they lived near its line or owned property in the vicinity, which fund was applied to the payment of the railway's debts, so that the property

could be conveyed to the city free and clear from all claims or liens. Plaintiffs were among those who contributed money to the fund raised for payment of the railway's debts, several of them having contributed substantial amounts.

During the month of November, 1928, the superintendent of public utilities of the city of Seattle announced that, December 3rd following, the city would abandon that portion of the railway lying south of the city limits, and would cease to operate cars thereon. Immediately prior to. the date fixed for the cessation of the railway operations over the portion of the road mentioned, plaintiffs instituted this action, for the purpose of restraining and enjoining the defendant city and its superintendent of public utilities from ceasing to operate that portion of the railway system above referred to. A temporary restraining order was issued, and, upon trial of the action, the court permanently enjoined the defendants from abandoning that portion of the railway system which is the subject matter of this action. From the decree entered by the trial court, defendants appeal.

For the purposes of this opinion, the city will be considered as the sole party appellant.

It was the contention of appellant that the operation of that portion of the railway system lying south of the city limits from January 1, 1922, to October 31, 1928, had resulted in a loss of over $125,000, and that this part of the railway could not be operated save at a substantial loss. We are satisfied that appellant made a sufficient showing along this line, and that its contention as to the operating loss above referred to is substantially correct. No proposition looking to the acquisition or operation of the electric line was ever submitted to the voters of the city of Seattle for adoption or rejection, and the city contends that, for this

reason, funds raised by the city from general taxation cannot be appropriated to the payment of any deficit arising from the operation of the railway. The city also contends that it has no other funds available for the absorption of such deficit.

It is admitted that between four and five thousand people reside in the district served by the railway, and that the district has, to some extent, been settled because of the existence of the railway, and that its continued operation is convenient to the people dwelling along or near its line.

It appears that, December 3, 1928, the department of public works of Washington granted the application of Suburban Transportation System for an extension of passenger and express service under a certificate of public convenience and necessity, authorizing service by motor busses in and through the territory between the city limits and Seahurst, now served by the electric railway.

Shortly after the announcement by the superintendent of public utilities that service over the railway line would cease, the city council, by ordinance No. 56583, directed the abandonment of that portion of the railway outside the city limits, which ordinance became effective prior to the trial of this action.

Authority is conferred upon appellant city to operate a street railway system by Rem. Comp. Stat., § 9488, the pertinent portion of this section reading as follows:

"Any incorporated city or town within the state be, and hereby is, authorized to . . . purchase . . . maintain, operate or lease cable, electric and other railways within the limits of such city or town for the transportation of freight, and passengers above or underneath the ground, with full authority to regulate and control the use and operation thereof, and

to fix, alter, regulate and control the fares and rates to be charged thereon . . ."

By Chapter 111, Laws of 1915, p. 317 (Rem. Comp. Stat., § 8968), the legislature validated the prior acts of cities of the first class in acquiring by gift electric railways partly within and partly without the corporate limits of such cities, and authorized the continued maintenance, conduct, and operation of such railways.

The charter of the city of Seattle, article IV, § 18, sub-paragraph 15, provides that:

"The city council shall have power by ordinance, and not otherwise: . . .

"To construct, condemn and purchase, purchase, acquire, add to, maintain, operate or lease cable, electric, steam and other railways within or without the limits of the city for the transportation of freight and passengers . . ."

In considering the question here presented, there must be borne in mind certain fundamental distinctions between the operation of a public utility by a municipality and such operation by a private person or corporation. Many courts have held that a private corporation will be by the courts, in proper cases, restrained from abandoning certain operations of its utility, even though such operations result in a loss *(Ft. Smith L. & T. Co. v. Bourland,* 267 U. S. 330), whether a transportation company or one for the distribution of water or electric current. In these cases, the courts have always carefully considered the entire situation, and allowed or refused to allow the utility to curtail its operations after careful consideration of all the circumstances of the case.

At the same time, in adjudicating such questions affecting private corporations, there is always present the basic fact that the courts can require a public serv-

ice company—and, in referring to such companies, we, of course, include a private individual engaged in the same business—to function only up to the limit of its resources. Such a company, theoretically, at least, may be obliged to furnish service at a loss until its finances become so involved that it is thrown into the hands of a receiver, and the receiver can continue operations only so long as money is available with which to pay operating expenses and make other necessary disbursements.

On the other hand, if courts require municipal corporations to continue the operation of public utilities, even though conducted at a loss, such action by the courts necessarily includes the requirement that money to cover deficits be raised either by general taxation, special assessments, or by appropriation from some fund in the possession of the municipality. It may be assumed at the outset that courts will be loath to interfere with the domestic affairs of municipal corporations, and, particularly, to require, against the expressed will of the municipal authorities, the rendition of public service, having reference to proprietary rather than governmental functions, when it appears that the giving of such service results in a financial loss to the municipality. Such an order should be entered only where it clearly appears that the law requires such action.

The franchise granted Mr. White by King county was for the period of fifty years. The resolution of the trustees of Highland Park & Lake Burien Railroad tendered the line to the city "for the purpose of operating the same as a street railway," and the ordinance of the city of Seattle accepting the gift was entitled, "An ordinance accepting the gift of Highland Park & Lake Burien Railroad upon the conditions and terms as set forth in the resolution adopted by the

board of trustees thereof on the fifth day of August, 1913," it having been pursuant to such tender and acceptance that the corporation executed and delivered to the city deeds and other instruments conveying to the city all of its real and personal property, both within and without the city, including its franchises.

It may be conceded at the outset that a municipal corporation may, by contract with a private public service corporation, bind itself to do or refrain from doing certain things, and that the obligation of such a contract cannot subsequently be impaired by the municipality. *Walla Walla v. Walla Walla Water Co.,* 172 U. S. 1. It has also been held by this court that a town council may enter into a valid contract to run beyond the term of office of the officials executing the same, and that the contract may be binding upon subsequent councils. *Tanner v. Auburn,* 37 Wash. 38, 79 Pac. 494. This court has also held that it is not within the power of a city to divest itself by any franchise grant of its governmental police power, the exercise of which is necessary for the public welfare and the preservation of public safety. *Tacoma v. Boutelle,* 61 Wash. 434, 112 Pac. 661. In the case last cited, it was held that a provision in a street railway franchise requiring that cars be run two round trips a day, fixed the minimum service only, and that the city council could at a later date require a much more frequent service, and that an ordinance requiring such service did not impair the obligation of the franchise contract.

The supreme court of Michigan, in the case of *People v. Detroit Citizens Street R. Co.,* 116 Mich. 132, 74 N. W. 520, considered a question somewhat similar to that presented to this court in the case last cited. The city of Detroit, by a thirty-year franchise, granted the right to operate a street railway within its limits, the franchise providing that the city would not require

cars to be run more than six miles an hour, or oftener than once in twenty minutes. Fifteen years later, by ordinance, the franchise was extended an additional thirty years, it being provided also that cars should be operated as the council might order. Thereafter, the council, by ordinance, provided for more frequent service, the ordinance being attacked by the company upon several grounds, including the contention that under its contract with the railway company the ordinance was invalid. The court considered all the prior ordinances, and said:

"In construing these ordinances, it may be worth while to inquire into the situation when they were passed. Detroit, in 1862, was a city of about 50,000 people."

The court considered the existing situation at length, and held that the extension ordinance which required that cars be operated "as the public convenience may require and the common council order" should control. The opinion in the Michigan case is of interest, as indicating that courts, in determining franchise rights, should, in proper cases, consider changed conditions. It would seem that the same rule should apply in such a case as this, which arises, not between a municipal corporation and its own grantee, but between persons who are endeavoring to enforce, as against a municipality, the provisions of a franchise granted by another municipal corporation, which franchise appellant holds as successor in interest to the original grantee.

Respondents cite the case of *State ex rel. Grinsfelder v. Spokane Street R. Co.*, 19 Wash. 518, 53 Pac. 719, 67 Am. St. 739, 41 L. R. A. 515, in which it was held that the courts would, by writ of mandamus, require a street railway company to continue operation of a line of its street railway which it desired to abandon. The case cited is important, and laid down a principle of

law from which we are not disposed to depart, although we do not deem the case controlling here. In the later case of *Day v. Tacoma R. & P. Co.*, 80 Wash. 161, 141 Pac. 347, L. R. A. 1915B 547, the *Grinsfelder* case was cited with approval, although the doctrine therein laid down was not held applicable.

Respondents also cite the case of *Columbus R., P. & L. Co. v. Columbus*, 253 Fed. 499, in which it was held that, if a railway company was under a statutory or contract duty to maintain and operate a line, it would be compelled to do so, even though such operation should result in loss. In the course of its opinion, the court said:

"If a railway company is under a statutory or a contract duty to maintain and operate a line, it will be compelled by injunction or mandamus so to do, even though the further operation should be at a loss. It is only when there is no valid or binding obligation to continue operation that the company may, at its discretion, abandon an unprofitable line or branch. If there is a binding obligation to maintain and operate a part of a system, it is questionable whether that part or branch can ever be abandoned, unless the losses inflicted by its continued operation are such as will wreck the entire system. On the other hand, if the operation of a railway line cannot be continued, owing to insolvency, a court will not by mandamus or otherwise try to compel its further operation; and this is particularly true, if its continued operation will perform no useful public service. This refusal of the courts to interfere does not proceed on the view that the company had a right to abandon the operation of an unprofitable system, or of an unprofitable branch. If there is a statutory or contract duty to maintain and operate, this obligation still remains in law, just as a debtor's obligation to pay his debts remains after he has become insolvent; but a court will not attempt to compel by mandamus or otherwise that which is manifestly futile and impossible, for a court has no means of providing capital to operate an insolvent rail-

way company, or to continue its operation after it has become insolvent. This, it seems to me, is all that can be claimed for the statement found in some cases that a court will not compel a continued operation at a loss of a railway line or branch.''

This opinion is of interest, as recognizing the doctrine that the courts will not order operation of a portion of a system, if such operation will result in the insolvency of the entire system, and also as indicating that the court will inquire into the benefit to the public to be attained by the continued operation of the railway.

In the case of *Fellows v. City of Los Angeles,* 151 Cal. 52, 90 Pac. 137, an action to compel the municipality to furnish water to the plaintiff, who resided outside the city limits, it was held that the city was under the law required to continue the service; but it appears that no question of operating loss was presented, that and other questions being expressly excepted from the decision.

In the case of *Inhabitants of City of Bordentown v. Anderson,* 81 N. J. Law 434, 79 Atl. 281, the court of errors and appeals of New Jersey held that a municipal corporation which had taken over a large portion of the property (including the franchises) of a water company, was not bound by unexpired contracts made by the water company with its patrons, but could charge for water furnished the reasonable value of the service.

The supreme court of Pennsylvania, in the case of *Reigle v. Smith,* 287 Pa. St. 30, 134 Atl. 380, held that the municipality was obligated to furnish water to the plaintiff, who resided outside the city limits, upon the same terms as it was supplying water to plaintiff's neighbors. The court, however, directed that the decree of the trial court be modified so that the same might not be construed so as to give the plaintiff the

right to water "when none would be available from the normal flow in the conduit, and make necessary the furnishing to Reigle, when a policy of discontinuance as to all consumers along the supply line was legally put in force, whereas no such right or obligation exists."

In the case of *Northern Pacific R. v. Washington Territory*, 142 U. S. 492, the supreme court of the United States refused to require the railroad to maintain a station at Yakima City, Washington, saying in the course of the opinion:

"No ground is shown for requiring the defendant to maintain stations both at Yakima City and at North Yakima; there are other stations furnishing sufficient facilities for the whole country from North Yakima southward to Pasco Junction; the earnings of the division of the defendant's road between those points are insufficient to pay its running expenses; and to order the station to be removed from North Yakima to Yakima City would inconvenience a much larger part of the public than it would benefit, . . ."

The court, also, citing its opinion in the case of *Texas & Pacific R. v. Marshall*, 136 U. S. 393, states that "the court will never order a railroad station to be built or maintained contrary to the public interest."

The supreme court of Kansas, in the case of *Asher v. Hutchinson Water, Light & Power Co.*, 66 Kan. 496, 71 Pac. 813, refused to enjoin a water company from removing its mains from certain streets upon which, in the judgment of the city council, public necessity no longer required water service, and laying the mains upon other streets where a greater necessity for the service existed, notwithstanding the fact that the removal of the mains greatly depreciated the value of property theretofore served. The court said:

"An individual can acquire no vested right as against the public in the continued service of a public

utility. Such a doctrine, once admitted, would destroy the convenience as a public utility. It would then become hampered, and subject to the control of the individual, and made to subserve such interests, to the detriment of the public welfare."

It is, of course, true that, in the case last cited and other authorities, the interest of the public appears from a different angle than in the case at bar. Here the public interest occupies two different, and possibly antagonistic, positions. On the one hand, there is the interest of the public as manifested by persons who desire to use the railway; on the other hand, one phase of the public interest would be subserved by abandoning a utility, owned by a municipal corporation, which is operated at a loss. In so far as the public interest should be considered by the courts in connection with this litigation, great weight should be given to the action of the city council, which has by ordinance directed the abandonment of the service, as the legislative body of the city must be presumed to be the best judge of the public interest and how the same will be best subserved.

In the case of *Day v. Tacoma R. & P. Co.*, 80 Wash. 161, 141 Pac. 347, L. R. A. 1915B 547, this court considered a complaint seeking an injunction restraining the abandonment of a line of electric railway. It appeared that there was a parallel line which could be used by the complainants and persons similarly situated. The court, construing the complaint as negativing the view that the complainants were absolutely dependent upon the line which it was proposed to abandon, held that it appeared that the same merely afforded them a more convenient service. This court affirmed the judgment of the lower court dismissing the action upon sustaining a demurrer to the complaint. It must be remembered that the record now before us discloses

that respondents will not, by the abandonment of the electric railway, be left without transportation facilities, the record merely showing that the continuance of service by the railway will add to their convenience and render their property more accessible, and consequently more valuable.

In the case of *Woody v. Port of Seattle,* 118 Wash. 163, 203 Pac. 59, it was held that the port should not be enjoined from abandoning a ferry service which it had maintained for several years. This court, in view of the facts that street car service was available, and a paved road could be used by automobiles, held the service by ferry to be, at most, only an added convenience, the maintenance of which at a loss would not be required. Attention was called to the fact that no obligations arising under any private charter had been taken over by the port district, which, to a great extent, distinguishes the case cited from the one at bar. This court declined to interfere with the discretion of the port commissioners in determining that the ferry service should be abandoned.

In the late case of *State ex rel. Howard v. Seattle,* 154 Wash. 475, 282 Pac. 829, it was held that the courts would not require the city to continue to furnish street car service over a spur line theretofore operated as a part of the municipal street car system. It is noted that the city took over the entire system free and clear from all franchise obligations of the prior owner. The court refused to interfere with the action of the city authorities in directing the abandonment of the spur line, quoting from the opinion of the court in the case of *Woody v. Port of Seattle, supra,* the statement that a public corporation was in a "different position from a private corporation," with respect to the abandonment of service by a public utility. In the course of its opinion, the court said:

"Much reliance is placed by the appellant upon the *Grinsfelder* case [19 Wash. 518], above cited but that case, as already appears, had to do with the right of a private corporation acting under a franchise to abandon part of the service which it had been furnishing, and is not applicable to the present situation.

"As pointed out, the city of Seattle took the street car system free from any of the franchise obligations of the prior owner. If the appellant's position were sustained, it would mean that the city could not, at any time or under any circumstances, abandon any part of its system, if such abandonment would be a material inconvenience to the patrons of that portion of the system, even though operated at a loss. If the system were owned and operated by a private corporation, then the question of whether it could abandon any portion of its service would be a matter for the state department of public works to determine.

"There is nothing in this case to show that the city was acting arbitrarily or capriciously, and we express no opinion upon the question as to what the result would be if the city were so acting."

Under the rule laid down by the foregoing authorities, it clearly appears that appellant may abandon the railway, unless it is prevented from so doing because of some obligation resting upon it by reason of the conveyance to the city of the county franchise, and the ordinance by which the assignment thereof was accepted.

 The original franchise granted to Mr. White "the right, privilege and authority and franchise, for and during the term of fifty (50) years" from the date of the ordinance, to construct and operate the railway. Section 11 of the franchise reads as follows:

"Said grantee, his successors and assigns, shall commence actual construction of said railway line within six months from the date hereof, and shall complete said railway line, and have the same in actual operation by the 1st day of July, 1912,"

and nowhere in the franchise is there any provision obligating the grantee to operate the railway. October 13, 1911, Mr. White assigned the franchise to Highland Park & Lake Burien Railroad, a corporation; the assignee assuming all the duties and liabilities imposed by the franchise upon Mr. White, but assuming no greater obligation.

August 5, 1913, the board of trustees of the corporation last above named passed a resolution reciting the construction of the railway, the suspension of service thereon, the financial entanglements of the corporation, that, in the opinion of the stockholders of the corporation, it was no longer possible for the company to operate the railway, and, in consideration of the premises, resolving that "the board of trustees of said corporation do hereby offer, tender and give to the city of Seattle, for the purpose of operating the same as a street railway, all of the properties hereinabove referred to," including railway franchises and other operating property.

October 16, 1913, the city of Seattle, by ordinance No. 31994, accepted the gift "upon the terms and conditions as set forth in the resolution duly adopted by the board of trustees of the corporation above referred to." January 14, 1914, the railway company, by warranty deed, conveyed the property to the city, the instrument of conveyance containing the following paragraph:

"All of said foregoing properties are hereby conveyed for the purpose of operating said street railway line, as provided in resolution duly adopted by the board of trustees of said first party August 5th, 1913, and as provided in ordinance No. 31994, approved the 16th day of October, 1913."

Mr. White, the original grantee of the franchise, assumed no obligation to operate the railroad by ac-

cepting the franchise; he did agree to construct the same within a fixed period, but it was evidently believed that the county was sufficiently protected by the right of forfeiture of the franchise for non-user in case the obligation to construct was not carried out, or in case the railway should subsequently be abandoned. There is, then, no franchise obligation to operate. If the city is bound to maintain service over the line, this obligation rests upon it because of the provisions in the resolution of the board of trustees above quoted, or the conditions of the deed above set forth, taken in connection with the ordinance of the city accepting the gift.

The city having operated the railway for approximately fifteen years subsequent to its acquisition thereof, there can be no question as to the good faith of the city in accepting the gift of the line, it being clear that the city has made a *bona fide* attempt to "carry on" and furnish transportation to those persons desiring the same. In McQuillin on Municipal Corporations (2nd ed.), vol. 4, p. 750 *et seq.*, is found the following:

"However, concerning the broad proposition whether under general charter and legislative obligation, apart from specific requirement positively imposed, the railroad or street car company must operate, the decisions are not harmonious. Many decisions rest upon the ground that the property of a railroad or street car company is charged with a public duty and held subject to the trust to execute the objects of its charter. Therefore, the right of a street car company to abandon its route on specified streets and public ways, at its mere pleasure, without the sanction of the state has been often denied.

"In the absence of special requirements imposed by charter, franchise, grant or statute these public duties are sometimes regarded as no greater than the public interests demand and justify. These duties are said to be merely 'to meet the public wants and exigencies. If there is not sufficient traffic over a particular line of

road to pay for the expense of running trains this is sufficient evidence that the public does not require it to be kept in operation; and in such case the company may cease operating the road unless this be contrary to the express terms of its charter.' Thus it was held that a carrier may be permitted to abandon a branch line which is not self-supporting, is in a dilapidated condition, and for the continued operation of which 'there is little public necessity,' where the road is insolvent with no means of obtaining the money for rehabilitating the branch, the operation of which in its present condition is dangerous, while its attempted operation jeopardizes the successful operation of the remainder of the system for which there is public need. 'In such circumstances,' said the court, 'the railroad company may abandon such unprofitable and irreclaimable part of its road, and neither the state nor unfortunate investors along the line can justly complain. They cannot force a railroad company to do the impossible.' . . .

"If power is simply conferred to construct a branch road but its construction is not made obligatory the company cannot be compelled to construct such branch, or having constructed it to maintain and operate it to the prejudice and the rights and interests of the company. Although when a road is constructed ordinarily a railroad company may not voluntarily abandon a line or cease to operate any portion of its road and may be compelled to resume operation, where it distinctly appears that there is not sufficient traffic to pay expenses, usually the company will not be required to operate at a loss. Moreover, it has been held that in the absence of charter or statutory obligation, the company may abandon operation of a road that cannot be operated except at a loss. But whether in the absence of charter or statutory duty, the operation of an unprofitable road or a portion thereof may be compelled depends on the particular circumstances of the case."

From the record before us, it appears that, ever since 1922, the entire railway taken over by the city under the deed above referred to has been operated at

a considerable loss. Appellant's witnesses testified that one-third of this loss should be allocated to the portion of the railway without the city limits, and on this basis the loss is as hereinabove stated. This testimony was admitted over respondents' objection, but in our opinion the evidence was competent and material. It also appears from the testimony that the line required repairs in order to keep the same in condition, which would require a large outlay. Patronage has steadily decreased, the ratio of decrease amounting practically to about three and one-half per cent a year.

Testimony was introduced by appellant to the effect that the abandonment of service over that portion of the railway outside the city limits would not result in great inconvenience to anyone. We do not attach any weight to this testimony; we are satisfied that the maintenance of the service is convenient to persons living in the vicinity of the line, and that its abandonment will result in inconvenience to them, and, also, in some depreciation in the value of adjoining property. The people, however, will not be left without means of transportation, although they will undoubtedly be required to pay more for the service.

We cannot refrain from applying to some extent our knowledge of existing conditions as the same affect urban transportation, particularly in regard to outlying districts such as that with which we are now concerned. The tremendous increase in the use of private automobiles has, during the past ten years, interfered to an extraordinary degree with the operation of street cars throughout cities. The operation of long lines of electric railway through sparsely settled communities has become well-nigh universally unprofitable. No reason exists for expecting any change in this situation; indeed, it may reasonably be anticipated that, from

now on, the lines will receive even less patronage than that with which they have been favored in the past.

Under the authorities, we hold that, in such a situation as is here presented, the court should take into consideration the entire situation, both from the standpoint of appellant as owner of the railway, and that of respondents as patrons of the line and owners of property in the vicinity. We are satisfied from the testimony that the expense of operating the line is far greater than is justified by the convenience of the service to anyone, taking into consideration all possible viewpoints. The entire line, apparently, is operated at a loss, but, as the city is not attempting to abandon any portion thereof within its own limits, we are not concerned with its right, if any, to cease such operation. We are concerned only with the question of whether or not appellant may abandon that portion of the line which it is operating by authority of law under a franchise granted by the county commissioners.

We are unable to construe the language of the resolution of the board of trustees of the then owner of the railway, coupled with the title and wording of the ordinance accepting the gift, and the paragraph of the conveyance which might be considered as explanatory thereof, as constituting a binding contract whereby appellant agreed to operate the railway during the full franchise period. The city accepted a gift of the property "for the purpose of operating the same as a street railway," no time limit being mentioned. The scope of this language neither was nor could be enlarged by the paragraph of the conveyance to the city above referred to. For fifteen years the city did operate the railway before endeavoring to abandon the same. If respondents prevail in this action, and the city is required to continue to operate the railway as a contractual obligation, it is probable that the city must so

continue to run cars over the line for the full period of the franchise grant, whether any reasonable need for such service persists or not, and regardless of any operating loss suffered.

We find nothing in the record, either by way of direct contract or of estoppel, which binds the city, under all the circumstances disclosed by the record now before us, to continue to operate that portion of the railway lying south of the city limits. This conclusion renders unnecessary discussion of other questions argued in the briefs.

The judgment appealed from is reversed, with instructions to the trial court to dismiss the action.

PARKER, FULLERTON, MITCHELL, MILLARD, BEELER, and MAIN, JJ., concur.

HOLCOMB, J., concurs in the result.

TOLMAN, C. J. (dissenting)—In my opinion, the right to operate which was granted to White carried with it the legal duty to operate for the full term. The city, by its contract, assumed that duty when it accepted the conveyance, and it is as much bound to operate as would be any public service corporation in like position. Therefore, it is my judgment that the case of *State ex rel. Grinsfelder v. Spokane Street R. Co.*, 19 Wash. 518, 53 Pac. 719, 67 Am. St. 739, 41 L. R. A. 515, is controlling here; and since, like the majority, I am unwilling to overrule that case at this time, I am convinced that the judgment appealed from should be affirmed.