WM. C. KAUFMAN AND OTHERS v. COUNTY OF SWIFT AND OTHERS.[1]

December 12, 1947.

No. 34,449.

---

[1]Reported in 30 N. W. (2d) 34.

*Kenneth Kivley* and *F. E. Wright,* for appellants.

*Frank A. Barnard,* County Attorney, *Charles B. Howard,* and *Dorsey, Colman, Barker, Scott & Barber,* for respondents.

JULIUS J. OLSON, JUSTICE.

This suit was brought by seven residents and taxpayers of defendant county to enjoin and restrain defendant county officers from erecting a hospital "either singly or jointly with the city of Benson," the county seat of defendant county; that defendants "be restrained by permanent injunction from signing, delivering, selling or disposing of the bonds of the County * * * for the purpose of sharing in the cost of the establishment of a county hospital"; and that the individual defendants, as officers of the county, be likewise enjoined "from drawing, issuing, delivering or cashing any warrants or checks of the County * * * given for the purpose of defraying the cost of the establishment or erection" of such hospital. Defendants' general demurrer was sustained, and plaintiffs have appealed.

The essential facts as alleged in the complaint may be summarized in this fashion: On October 1, 1946, the board of county commissioners adopted a resolution reading as follows:

"Be it resolved by the board of county commissioners of Swift County, Minnesota, that said board deems it expedient and necessary to establish and it is proposed to establish a county hospital jointly with the city of Benson, Minnesota, pursuant to Chapter 558 [557] of the Laws of Minnesota of 1943, that the location of said hospital is proposed to be located at Benson, Minnesota, that the cost of the same, including equipment, will not exceed the cost to the said city and county combined of $300,000, in which sum the said county of Swift shall not share in excess of the sum of $200,000, that the time of the election on the question of the said county of Swift participating in the erection of said hospital by selling bonds therefor shall be at the next general election in the said state of

Minnesota, to be held on Tuesday, November 5th, 1946, and that the county auditor of said Swift County, Minnesota, is hereby directed to give the proper notice for said election according to law."

Pursuant thereto, the county auditor prepared a ballot which read as follows:

"Sample Ballot
for
Election
November 5, 1946.
Swift County, Minnesota
Leo E. Engleson
County Auditor

---

"Voters desiring to vote in favor of either proposition place a cross in the square opposite the word 'Yes.'

"Voters desiring to vote against either proposition place a cross in the square opposite the word 'No.'

"Vote on Both Propositions

---

"For the erection of hospital buildings, including equipment, to be located at Benson, Minnesota, at a cost to the said city and county combined of $300,000 in which sum the said county of Swift shall not share in excess of the sum of $200,000, pursuant to the resolution of the board of county commissioners passed the 1st day of October, 1946.

"Yes⎯⎯⎯⎯
"No⎯⎯⎯⎯

"In favor of selling bonds in an amount of not to exceed $200,000 for the purpose of sharing in the cost of the establishment of a county hospital jointly with the city of Benson, Minnesota, to be located in the city of Benson, Minnesota, the combined cost of the same, including equipment, not to exceed the cost to the said city and county combined of $300,000.

"Yes_____
"No_____ "

The result was as follows: As to the first question, there were 2,427 votes cast in favor of it and 1,608 votes against it. As to the second question, the vote was 2,279 for and 1,603 against it. The total vote cast at that election was 4,334 (see Legislative Manual, 1947, p. 338), so it is obvious that of the total number voting at the general election most of them exercised their choice on the proposals to be voted on for establishing the hospital.

The legal problems presented here may well be considered and determined as follows: (1) Whether the county had power to construct a hospital jointly with the city; (2) whether the propositions were properly submitted to the voters; (3) whether an agreement between the county and the city for the joint construction and operation of a hospital was a prerequisite to the calling of any election; and (4) whether the county, by incurring the obligations of the present bond issue, will thereby exceed its statutory limit of indebtedness.

It is clear that this suit arises because of the proposal to erect a joint city and county hospital, the direct participants being defendant county and the city of Benson. The city was not a party litigant. The legal problems will be considered and disposed of in the order stated above.

Directly involved here is M. S. A. 471.59, subd. 1, which provides in part:

"Two or more governmental units, by agreement entered into through action of their governing bodies, may *jointly* exercise any power *common* to the contracting parties." (Italics supplied.)

As to the power of the county to acquire or build a hospital, we find that M. S. A. 376.01 furnishes the requisite authority. It provides:

"It shall be lawful for the county board of any county in this state to acquire * * * lands * * * for hospital purposes * * *

and to erect suitable buildings thereon * * * for such hospital purposes."

The grant of power is broad and comprehensive.

The authority of the city of Benson is governed by its home rule charter. Chapter IV, Sec. 20, grants to the city council "the general management and control" of its finances, including "authority to make, amend or repeal" all such ordinances and resolutions deemed "expedient for the government and good order of the city, for the protection of the public and the public health, comfort and safety." By 57th of the same chapter and section, the council may *"establish and regulate City hospitals* or pest houses, and * * * make all regulations which may be necessary and expedient for the preservation of health, and the suppression of disease." (Italics supplied.) By Chapter V, Sec. 9, the city is given the power to borrow money and to issue bonds for such amount as may be authorized by a majority of the legal voters of the city voting upon the question. We think authority of the two *governmental units* presently involved is *common* to both.

Plaintiffs challenge the constitutionality of § 471.59, asserting that it violates Minn. Const. art. 11, § 6. That section provides that "No money shall be drawn from any county or township treasury except by authority of law." Art. 4, § 33, prohibits special legislation. Plaintiffs' challenge is not fortified by any citation of authorities. They simply *assert* lack of constitutional authority and rest their argument there. We must be ever mindful of the presumption favoring the validity of statutory enactments. "Every law is presumed to be constitutional." 6 Dunnell, Dig. & Supp. § 8929, and especially cases under note 40. This presumption is founded upon the cardinal principle of statutory construction that its purpose is to *save and not to destroy.* N. L. R. B. v. Jones & Laughlin Steel Corp. 301 U. S. 1, 57 S. Ct. 615, 81 L. ed. 893, 108 A. L. R. 1352; 6 Dunnell, Dig. & Supp. § 8931. Cf. State v. Finnegan, 188 Minn. 54, 246 N. W. 521. True, § 471.59, subd. 1, does not authorize the expenditure of *public* funds for private purposes. However, the ex-

penditures to be made are for purely public purposes and are within the granted powers of both municipalities. As to the general welfare provision of the city's charter, the grant of authority thereby given is adequate. Very helpful is Sverkerson v. City of Minneapolis, 204 Minn. 388, 391, 283 N. W. 555, 557, 120 A. L. R. 944, and cases there cited. So, also, are cases from other jurisdictions which sustain defendants' position. Among others, the following are helpful: Cumnock v. City of Little Rock, 154 Ark. 471, 243 S. W. 57, 25 A. L. R. 608; Goodall v. Brite, 11 Cal. App. (2d) 540, 54 P. (2d) 510; Oliver v. Hall County Memorial Hospital, 62 Ga. App. 95, 97, 8 S. E. (2d) 138, 139. We conclude that upon this record lack of constitutional authority is not shown.

With respect to the county auditor's submission of two questions to the voters instead of having both submitted as one, we find no difficulty. Obviously, both questions as submitted required a majority vote. By M. S. A. 376.04, statutory directions are clearly stated. While the "question of erecting hospital buildings" is to be submitted upon a "separate ballot," the form prescribed by that section was in fact followed in the two ballots prepared by the auditor. No one could be misled. Here, as in Wester v. Village of Albany, 210 Minn. 553, 555, 556, 299 N. W. 214, 216, "we do not conceive, * * * that the voters of the village were in any way deceived or misled to their prejudice into voting for the bond issue," and we may well conclude, as there said, "that we do not regard objections based upon technicalities not prejudicial to the taxpayers as valid."

Plaintiffs further contend that an agreement was required to be duly entered into between the county and the city for their joint construction and operation of a hospital, and that such agreement was a prerequisite to the submission of the question to the voters.

The argument for defendants is that § 471.59 (L. 1943, c. 557) furnishes the answer. The authority to *exercise any power common to both contracting municipalities is therein provided for.* This act opened a new and enlarged field for the joint sharing of benefits and the bearing of burdens incident thereto. Apparently our enactment was taken from California, where a similar statute was sustained

by its supreme court in In re City and County of San Francisco, 191 Cal. 172 (the California act is quoted at pp. 178 and 179), 215 P. 549, 553. Cf. City of Oakland v. Williams, 15 Cal. (2d) 542, 103 P. (2d) 168.

The 1943 statute grants general powers and discretion to the governing bodies of the merged municipalities, which have the responsibility of putting the statutory plan and purpose into effect. The result is the proper exercise of a legislative function by a statutory governing body delegated to carry out the legislative will.

The statute furnishes *authority* for municipalities to agree to *exercise* by joint action any power *common* to both. Whether such an enterprise was to be put into operation here before or after a vote of the people was had was not the final or controlling factor. Such submission was not an *exercise* of the authority granted by the act, since approval by the voters of the county would in any event have to be obtained before the enterprise could become an actuality.

Lastly and finally, plaintiffs assert in their complaint that the county's statutory debt limit will be exceeded if the $200,000 bond issue is to be added to its present obligations. The assertion is not well founded. Plaintiffs say nothing about the county's net "obligations" after deduction of the obligations incurred in respect to the construction of public drainage ditches, all of which are deductible in the determination of its net *obligations* under the provisions of M. S. A. (West edition) 475.03, subd. 6(3). That the county commissioners were well versed in the financial affairs of their county cannot be doubted. It is not for us to speculate as to what the facts are. It was the duty of plaintiffs specifically to point out why, where, and how the debt limit had been or would be violated.

What has been said disposes of the case on its merits. While other points have been argued in counsel's briefs, upon careful examination thereof we conclude that these do not require special treatment. The trial court's order is affirmed.

Affirmed.

MATSON, JUSTICE (concurring).

I concur with the majority opinion. A careful reading of M. S. A. 471.59 indicates that the execution of a joint agreement between the county and the city is not a condition precedent to the taking of any action at all. Certainly, the existence of such a joint agreement was not a prerequisite to the submission of the proposition to the voters for their approval or rejection. The actual wording of the first sentence of subd. 3 becomes significant in construing subd. 1. It reads:

"Subd. 3. The parties to such agreement may provide *for disbursements* from public funds to carry out the purposes of the agreement." (Italics supplied.)

The agreement itself does not provide the funds, but only governs the manner in which the funds are to be spent. Obviously, there was here no vital reason why a joint agreement should have been made to govern the disbursement of funds before the funds were made available by a favorable vote of the people. If the vote of the electorate had been unfavorable, there would have been no occasion for the agreement or for the exercise of any common powers thereunder.

PETERSON, JUSTICE (dissenting).

I think that entering into the agreement between the county and the city and then acting jointly under the agreement are by the terms of the statute conditions precedent to the issuance by the county of any bonds for the purposes mentioned or taking any steps for that purpose.

The statutory and charter provisions cited in the majority opinion authorize the county and the city separately to provide for a county and a city hospital respectively. There is no statutory provision authorizing the county to provide a city hospital nor any charter provision authorizing the city to provide a county hospital. Absent such a statute, the county lacks power to provide a hospital for the city. Village of Glencoe v. County of McLeod, 40 Minn. 44,

41 N. W. 239; Borough of Henderson v. County of Sibley, 28 Minn. 515, 11 N. W. 91.

Where there is no statute governing the matter, a county and a city each having the power to erect and maintain a hospital may join in the exercise of their respective powers to provide one hospital for both the county and the city. White v. City of Chatfield, 116 Minn. 371, 133 N. W. 962; Annotation, 123 A. L. R. 997.

But here there is a statute regulating the joint exercise of the separate powers of the city and the county. I take it that it is too elementary to require citation of authority to the effect that the mode of exercising the powers of the county and the city is subject to legislative regulation. For example, it seems that there can be no reasonable basis for contending that the city and county board of control of the county of Ramsey and the city of St. Paul, provided for by Sp. L. 1876, c. 77, as amended by Sp. L. 1883, c. 54, as amended by Sp. L. 1885, c. 78, has the power to issue bonds which by statute is vested in the county and city jointly. See, Kempien v. Board of Co. Commrs. 160 Minn. 69, 199 N. W. 442. Likewise, no one can well contend that the county of Hennepin and the city of Minneapolis had the power to issue bonds to provide for a new courthouse and city hall under the statutes involved in State ex rel. Bd. of C. & C. H. Commrs. v. Cooley, 56 Minn. 540, 58 N. W. 150, which vested that power in a board of courthouse and city hall commissioners. Where a statute authorizes a county or a city to issue bonds in a certain manner, the manner specified is exclusive, and compliance therewith conditions the validity not only of the exercise of the power, but also that of any bonds issued thereunder. Goodnow v. Board of Co. Commrs. 11 Minn. 12 (31) ; Rogers v. Le Sueur County, 57 Minn. 434, 59 N. W. 488.

The provisions of § 471.59, under which the county assumed to act, when considered as a whole, reveal a legislative intention that an agreement for joint action shall be the basis for any action at all. It provides in subd. 1 that *by an agreement* entered into a county and a city may *jointly exercise* any power common to both. The agreement is required to define what action shall be taken and

how it shall be exercised jointly. Hence, the agreement is a condition precedent to any action at all, and in any event there must be joint action by the parties.

Subd. 1 of § 471.59, authorizing a county and a city "by agreement entered into through action of their governing bodies" to *"jointly* exercise any power common to the contracting parties" (italics supplied), should be construed in connection with subds. 2 and 3, which read:

"Subd. 2. Such agreement shall state the purpose of the agreement or the power to be exercised and it shall provide for the method by which the purpose sought shall be accomplished or the manner in which the power shall be exercised.

"Subd. 3. The parties to such agreement may provide for disbursements from public funds to carry out the purposes of the agreement. Funds may be paid to and disbursed by such agency as may be agreed upon, but the method of disbursement shall agree as far as practicable with the method provided by law for the disbursement of funds by the parties to the agreement. Strict accountability of all funds and report of all receipts and disbursements shall be provided for."

It is clear that under subd. 1 the county has no power to act with respect to the matter at all, except *by agreement* entered into with the city, and then only through the *joint exercise* by the county and the city of their separate powers in the premises. Where a statute grants a *joint* power, it can be exercised only by all the grantees acting jointly or together. One of them cannot act alone. Reclamation Dist. No. 3 v. Parvin, 67 Cal. 501, 8 P. 43. Here, because there was no such agreement, the county in attempting to issue the bonds in question is attempting to exercise alone a power that was granted to it and the city jointly. This it cannot do.

This construction of subd. 1 is underscored by the first sentence of subd. 3, to the effect that *the parties to such an agreement* may provide funds *to carry out the purposes of the agreement.* It seems clear that this language means (1) that the county cannot issue the

bonds in question unless it is a party to such an agreement; and (2) that the purpose of issuing the bonds must be to carry out the agreement. Here both requirements are lacking. The county is not a party to such an agreement. Because there is no agreement, the purpose cannot be, and is not, to carry out any agreement.

If the action of the county should be upheld and later it should develop that the county and the city were unable to agree upon the terms to be embodied in the agreement, the county would be in the position of having raised money by the bond issue for a purpose impossible of achievement. That purpose is the only one for which the bonds may be issued under the statute. There is no authorization for the loose and purposeless administration of public finances disclosed here. It is not only unauthorized, but it is calculated to increase an already burdensome public indebtedness.

FRANK T. GALLAGHER, JUSTICE (dissenting).

It appears to me that under M. S. A. 471.59 the entering into of an agreement between the county and the city for the joint construction of the hospital was a prerequisite or a condition precedent to an election on the question of issuing the bonds. Subd. 1 clearly provides that two or more governmental units, by agreement entered into through action of their governing bodies, may jointly exercise any power common to the contracting parties. By that language, it would seem that the governmental units must first enter into their agreement before they can jointly exercise any power common to both. Subd. 2 provides that the agreement shall state the purpose or power to be exercised, and it provides for the method by which the purpose sought shall be accomplished or the manner in which the power shall be exercised. Subd. 3 states in part that the parties to such agreement may provide for disbursements from public funds to carry out the purposes of the agreement. Subd. 4 refers to the termination of the agreement. Subd. 5 states that the agreement shall provide for the disposition of any property acquired as the result of such joint exercise of powers and for the return of any surplus moneys in proportion to contributions of the several con-

tracting parties after the purpose of the agreement has been completed.

All subdivisions of this section so definitely refer to the agreement between the governmental units that it seems as if the intention must have been that the agreement should be entered into through action of the governmental bodies before exercising any power common to the contracting parties. Here, in the absence of such an agreement, it appears that "the county in attempting to issue the bonds in question is attempting to exercise alone a power that was granted to it and the city jointly," as stated by Mr. Justice Peterson in his dissenting opinion.

I cannot see where the voters were misled in connection with the ballot prepared by the county auditor, even though two questions were to be voted on. It appears from a reading of the ballot submitted that the propositions to be voted upon were stated in sufficiently clear language to be understood by the voters. The fact that 2,427 voters voted "yes" and 1,608 voted "no" on the first question and that 2,279 voters voted "yes" and 1,603 voted "no" on the second question would clearly indicate that they understood what they were doing. However, in view of the fact that it appears to me that the governing bodies of the county of Swift and the city of Benson should have entered into an agreement as provided by § 471.59 prior to the time the county attempted to issue the bonds in question, I cannot concur with the majority opinion.