KENTUCKY–INDIANA MUNICIPAL POWER ASSOCIATION for Itself and its Members and the Cities of Crawfordsville, Huntingburg, Washington, Tipton and the Town of Ferdinand, Indiana, Petitioners-Appellants,

v.

PUBLIC SERVICE COMPANY OF INDIANA, INC., Southern Indiana Gas and Electric Company, City of Anderson, Indiana, and City of Richmond, Indiana, Respondents-Appellees.

No. 2–676A217A.

Court of Appeals of Indiana, Third District.

Aug. 27, 1979.

William S. Lett, Schneider, Lett & Verkamp, Huntingburg, for appellants; Wallace L. Duncan, Fredrick D. Palmer, Duncan, Brown, Weinberg & Palmer, Washington, D. C., of counsel.

Charles W. Campbell and Ronald J. Brothers, Plainfield, for Pub. Service Co. of Ind.

Fred P. Bamberger and Mark L. Phillips, Evansville, for Southern Ind. Gas & Elec. Co.

**HOFFMAN, Judge.**

On July 26, 1975, appellants filed a petition with the Public Service Commission of Indiana (Commission) which sought approval of the agreement which created appellant Kentucky-Indiana Municipal Power Association and sought other related declaratory relief. The Commission dismissed the petition for want of jurisdiction and this appeal followed. In 1957, the General Assembly enacted the Interlocal Cooperation Act, IC 1971, 18–5–1–1 et seq. (Burns Code Ed.), hereinafter referred to as the 1957 Act. IC 1971, 18–5–1–1 provides:

"It is the purpose of this act [18–5–1–1— 18–5–1–7] to permit local governmental units to make the most efficient use of their powers by enabling them to cooperate with other localities on a basis of mutual advantage and thereby to provide services and facilities in a manner and pursuant to forms of governmental organization that will accord best with geographic, economic, population and other factors influencing the needs and development of local communities."

It empowers public agencies [1] to enter into agreements providing for joint and cooperative action, specifies the essential elements of such agreements and authorizes the establishment of separate legal entities to conduct joint and cooperative undertakings. IC 1971, 18–5–1–4.[2]

In 1972, IC 1971, 18–5–1.5–1 et seq. (Burns Code Ed.), hereinafter referred to as the 1972 Act, was enacted to supplement the 1957 Act. It enabled local governmen-

---

[1]. The term "public agency" as defined in the 1957 Act includes "any city, town, county or other political subdivision of this state; any agency of the state of Indiana or of the United States; and any political subdivision of another state." IC 1971, 18–5–1–3.

[2]. In effect, this act furnishes authority for municipalities and other public agencies to exercise jointly any power which they could exercise independently. *City of Oakland v. Williams* (1940) 15 Cal.2d 542, 103 P.2d 168 (municipalities could exercise common power to contract for survey of sewage disposal under Joint Exercise of Powers Act); *Beckwith v. County of Stanislaus* (1959) 175 Cal.App.2d 40, 345 P.2d 363 (county and irrigation district could exercise mutual power to construct bridges under Joint Exercise of Powers Act); *Kaufman v. County of Swift* (1947) 225 Minn. 169, 30 N.W.2d 34 (city and county could exercise mutual power to erect hospital pursuant to Joint Exercise of Powers Act).

tal units [3] to make contracts with other local governmental units instead of merely authorizing cooperation. In 1975, the 1972 Act was amended to emphasize its supplemental nature:

"The provisions of this chapter [18–5–1.5–1—18–5–1.5–7] shall be supplemental to IC 1971, 18–5–1 [18–5–1–1—18–5–1–7] and to all laws on the subject of interlocal government cooperation. Local governmental units may use whichever law it deemed [deems] necessary to achieve their desired purpose."

IC 1971, 18–5–1.5–7.

Pursuant to these statutes, on February 7, 1973, the Indiana cities of Crawfordsville, Jasper, Huntingburg, and Washington in conjunction with the cities of Paris and Frankfort from the sister state of Kentucky, executed a Joint Agreement forming the Kentucky-Indiana Municipal Power Association (KIMPA).[4] This agreement authorized KIMPA to perform all functions necessary for the development and implementation of a viable bulk power supply program for its members. Specifically, the Joint Agreement provided that the purposes of KIMPA, as an agency and instrumentality of the cities which are or shall become members, are to construct, operate and maintain generating plants and transmission systems in order to deliver electrical power and energy to its members; to sell, deliver, exchange or otherwise dispose of the power and energy generated by said plants; to borrow money and to issue various types of securities; and to secure the payment thereof by indenture, agreement, contract or other evidence of indebtedness.

On April 17, 1975, KIMPA and its constituent members executed Bulk Power Supply Agreements which provided, *inter alia*, the necessary security for KIMPA to finance the development of its bulk power supply program by the sale and the issuance of its own bonds. Under these agreements, KIMPA is to perform engineering, legal and financial consulting services for the development of the initial plans regarding generating plants and transmission systems. The costs incurred by KIMPA are to be funded by the issuance of KIMPA bonds, notes, bond anticipation notes or other obligations in an amount not to exceed $100,000. The members agree to guarantee KIMPA's financial obligations by making pro rata payments to KIMPA 30 days prior to the maturity dates of these obligations.

On July 16, 1975, KIMPA filed a petition with PSC for itself and on behalf of its Indiana members.[5] The "Conclusion and Prayer for Relief" portion of that petition reads as follows:

"IV. CONCLUSION AND PRAYER FOR RELIEF

Based on the foregoing, KIMPA concludes that it has the legal ability to carry out in all respects its bulk power supply program, and respectfully requests the following declarations and relief from this Commission:

1. A determination of the extent to which this Commission has jurisdiction over an Association formed under the Interlocal Cooperation Act for the purpose of developing and implementing a bulk power supply program and otherwise engaging in the business of providing electric power to its members;

2. Approval of the Joint Agreement forming KIMPA under the Indiana Interlocal Cooperation Act if the Commission has jurisdiction in the premises;

3. Approval of the action by KIMPA's Indiana members in entering into the Power Supply Development Agreements (Exhibits F1–F5) to the extent

---

3. The term "local governmental units" is defined as "any city, town, county, township, school corporation, special taxing district, municipal corporation, political subdivision or agency of the state of Indiana." IC 1971, 18–5–1.5 ·2.

4. By subsequent amendments, the Indiana municipalities of Ferdinand and Tipton were ad-

mitted to KIMPA. The city of Jasper, Indiana withdrew from KIMPA on April 7, 1974.

5. Subsequent to the filing of the KIMPA petition, petitions to intervene on behalf of the Southern Indiana Gas and Electric Company, the Public Service Company of Indiana, and the cities of Anderson and Richmond, Indiana were granted by PSC.

the Agreements may constitute contracts for the issuance of debt or evidence of indebtedness and to the extent the Commission has jurisdiction;

4. Assuming jurisdiction in the premises, a determination of the following questions:

(a) Under the Interlocal Cooperation Act of Indiana, may Indiana municipalities join together, and with municipalities of other states, to provide electrical power to themselves on a joint basis through the entity formed?

(b) May an Association formed under the Interlocal Cooperation Act of Indiana issue revenue bonds and/or bond anticipation notes in its own name, secured by bulk power supply contracts with its members, for the purpose of:

(i) Constructing its own electric generating facilities that will not be located within 6 miles of any of the Indiana municipalities' boundaries nor in the same county as any of the Indiana municipalities?

(ii) Purchasing equity ownership or unit participation in an electric generating facility constructed and operated by an investor owned utility or public agency not a member of KIMPA where the facility will not be within 6 miles of any of the Indiana municipalities' boundaries nor in the same county as any of the Indiana municipalities?

(c) Assuming an affirmative answer to the questions posed in (b), need KIMPA obtain the approval of this Commission for the issuance of debt and would this Commission have jurisdiction over rates established by contract between KIMPA and its members?

(d) Assuming an affirmative answer to the questions posed in (b), need KIMPA seek a certificate of convenience and necessity from this Commission for each component part of a bulk power supply program?

(e) Assuming an affirmative answer to (d) is KIMPA an entity that can qualify to hold a certificate of convenience and necessity under Indiana law?"

On May 27, 1976, the Commission entered its order dismissing the petition, concluding that it did not have the statutory authority to issue declaratory rulings.

The question presented by this appeal is whether, under the applicable statutes, the Commission had jurisdiction over the subject matter set out in appellants' petition.

■ It is a fundamental principle of law that the Public Service Commission, as an administrative agency of the State of Indiana, is a body of limited jurisdiction which derives its authority solely from the Legislature and thereby possesses only such powers as are conferred on it by statute. *Ind. Bell Tel. Co., Inc. v. Friedland* (1978), Ind.App., 373 N.E.2d 344; *Town of Merrillville v. Lincoln Utilities, Inc.* (1976), Ind. App., 355 N.E.2d 851; *Boone Co. REMC et al. v. Pub. Serv. Comm.* (1958), 129 Ind.App. 175, 155 N.E.2d 149. Unless a grant of power can be found in the statute, it must be concluded that there is none. *Indiana Tel. Corp. v. Indiana Bell Tel. Co.* (1976), Ind.App., 358 N.E.2d 218. Moreover, the functions vested in the Commission by the General Assembly are not judicial in nature but rather are of an administrative character. *Indiana Tel. Corp. v. Pub. Serv. Comm.* (1960), 131 Ind.App. 314, 171 N.E.2d 111.

■ That the Commission acted in accordance with these principles seems clear. Judging from the "Conclusion and Prayer for Relief" section of the petition, it is apparent that appellants sought declaratory rulings adjudicating the legality of the Joint Agreement and the extent of the Commission's jurisdiction over KIMPA and the activities contemplated thereby. But insofar as there is nothing in its enabling acts which authorizes the Commission to issue the declaratory relief requested, it must be concluded that appellants chose the wrong forum to litigate these questions.

The Public Service Commission is primarily a factfinding body. *Johnson Cty. Rural Elect. v. Public Serv. Co.* (1978), Ind.App., 378 N.E.2d 1. It issues orders based on impartial findings of fact. The issues raised by appellants' petition involved a determination of their rights, status, and legal relations under various statutes. A declaratory judgment proceeding before a court of record would have been the appropriate method for adjudicating this controversy. See IC 1971, 34–4–10–1 (Burns Code Ed.).

■ Nevertheless, appellants maintain the Commission took too narrow a view of its jurisdiction and insist that the source of its jurisdiction cannot be found entirely within the four corners of its enabling legislation. Rather they submit that the 1957 Act, IC 1971, 18–5–1–6 in particular, expanded the Commission's jurisdiction to include the power to approve agreements consummated under the Act and to issue declaratory rulings on the validity of those agreements. That statute reads as follows:

"In the event that an agreement made pursuant to this act [18–5–1–1—18–5–1–7] shall deal in whole or in part with the provision of services or facilities with regard to which an officer or agency of the state government has constitutional or statutory powers of control, the agreement shall, as a condition precedent to its being in force, be submitted to the state officer or agency having such power of control and shall be approved or disapproved by him or it as to all matters *within his or its jurisdiction* in the same manner and subject to the same requirements governing the action of the attorney-general pursuant to section 4(f) [18–5–1–4] of this act. This requirement of submission and approval shall be in addition to and not in substitution for the requirement of submission to and approval by the attorney-general." (Emphasis supplied.)

Appellants misconstrue the purpose of this statute. It does not confer jurisdiction on the Commission or any other administrative body but simply grants approval powers if jurisdiction is obtained elsewhere. In no way does this law vest the Commission with authority to issue declaratory rulings.

Resolution of the remainder of this appeal then hinges on whether the Joint Agreement or the Bulk Power Supply Agreements "deal in whole or in part with the provision of services or facilities" over which the Commission has jurisdiction.

■ Appellants cite four statutes as being applicable here with respect to the Commission's jurisdiction. The first of these statutes provides that the Commission shall have jurisdiction over the rates charged by municipal utilities in Indiana. IC 1971, 18–1–21–5 (Burns Code Ed.). While it is true that so far as rate-making is concerned municipal utilities are subject to regulation by the Commission, the question of rates was not before that body since the petition did not contain a request to fix rates. Consequently, this statutory provision is of no aid to appellants in their present objective.

■ The next statutes to be considered provide that the Commission has jurisdiction over the construction and ownership of electric generating plants by Indiana municipal utilities to the extent that such plants are located within the boundaries of a service area of a corporation formed pursuant to the Rural Electric Membership Corporation Act, IC 1971, 8–1–13–1—8–1–13–27 (Burns Code Ed.).

The statutes pertaining to REMC utilities afford no basis for relief either. From the sum and substance of their petition, it is plain that appellants are not seeking approval to construct or own an electric utility within a particular REMC service area. Even if they had sought such approval, their petition was infirm in that it did not include a request for the Commission to declare "that public convenience and necessity require the respective construction, ownership, operation, management or control." IC 1971, 8–1–13–18(b). Appellants have not shown how the facts of this case bring it within the purview of the REMC statutes.

■ Similarly, IC 1971, 8–1–2–90 (Burns Code Ed.) is inapplicable. That statute reads in part as follows:

"Any municipality in the state of Indiana is hereby empowered, subject to the provisions of this act [8–1–2–1—8–1–2–120] applicable thereto, to own, lease, erect, establish, purchase, condemn, construct, acquire, hold and operate any utility within the boundaries of such municipality, and within a radius of six [6] miles from the corporate limits of such municipality, without the consent or control of any department, bureau or commission other than the municipal council of the municipality in which such utility may be operated."

*Assuming arguendo* appellants are correct in their contention that this statute empowers municipalities to own or construct utilities outside the six-mile radius subject to approval by the Commission, it is of no consequence since appellants frankly admit they are not seeking approval to own or construct specific electric generating and transmission facilities.

■■■ The final statute relied upon by appellants is IC 1971, 18–1–21–5 (Burns Code Ed.) which reads in part as follows:

"No municipal corporation shall enter into any contract . . . to issue bonds, notes, evidences of indebtedness or other obligations without the approval of the public service commission, as provided by law."

Appellants allege that this statute confers jurisdiction on the Commission to approve portions of the Bulk Power Supply Agreements.

In essence, these agreements provide that KIMPA will finance the association's developmental costs by the sale and issuance of bonds, notes, bond anticipation notes or other obligations. To reimburse KIMPA for these expenses, the member-municipalities bind themselves to make specified payments from their respective utility revenue funds thirty days prior to the maturity date of these obligations. The agreements also provide that no member shall be obligated to make any payments if KIMPA issues bonds on or before the maturity date of

such obligations in an amount sufficient to pay the principal of and interest on said obligations. Appellants suggest that these agreements to reimburse KIMPA constitute "evidences of indebtedness" over which the Commission has jurisdiction.

This contention must be rejected. An essential characteristic of an "indebtedness" is the obligation to repay. *Halm et al. etc. v. Hincher Mfg. Co. of Ind.* (1953), 124 Ind.App. 174, 115 N.E.2d 731. Moreover, in its strict legal significance,

"An indebtedness cannot arise unless there is either a legal, equitable, or moral obligation to pay a sum of money to another, who occupies the relation of a creditor, and who has a legal or moral right to call upon or constrain the debtor to pay. *State v. Hawes,* 112 Ind. 323, 14 N.E.Rep. 87. It is not always essential, in order to the existence of an indebtedness, that there should be an absolute legal right to coerce payment, as in that sense the state could never become indebted. *Mayor v. Gill,* 31 Md. 375. It is, however, essential to the idea of a debt that an obligation should have arisen out of a contract, express or implied, which entitles the holder thereof unconditionally to receive from the promisor a sum of money, *which the latter is under a legal or moral duty to pay without regard to any future contingency." Quill v. Indianapolis,* 124 Ind. 292, 23 N.E. 788 at 790–791. (Emphasis added.)

In the case at bar, these agreements to reimburse KIMPA are contingent liabilities as opposed to an indebtedness since each municipality's obligation to pay depends for effect on an event that may or may not occur. In other words, if KIMPA issues bonds sufficient to satisfy the developmental cost obligations, then the municipalities are not obligated to make any payments under these agreements. Therefore, the Commission was correct in its conclusion that it could not approve any part of the Bulk Power Supply Agreements.[6]

6. Even if these agreements were "evidences of indebtedness", the Commission still could not

approve them insofar as appellants failed to submit the necessary financial information so

There is a question raised in appellees' brief which needs clarification.

In the formative stages of this appeal the appellees moved this Court to dismiss the appeal for want of jurisdiction. The motion was denied by order, but counsel again argued in their principal brief and in oral argument that the appeal should be dismissed or summarily affirmed. They claim that the record filed with this Court is defective for three reasons: (1) the assignment of errors was filed separately from the transcript in contravention of Ind.Rules of Procedure, Appellate Rule 7.2(A)(1); (2) virtually none of the transcript contains the marginal notations required by AP. 7.2(A)(3); and (3) certain pages do not have the lines numbered, again as required by AP. 7.2(A)(3).[7]

Counsel urge us to both clarify the standard by which compliance with the rules is to be gauged and to apply that standard uniformly.

The decisions in *Scott Paper Co. v. PSC* (1975), 164 Ind.App. 565, 330 N.E.2d 137, and *Moore v. Spann* (1973), 157 Ind.App. 33, 298 N.E.2d 490, *reh. den.* 302 N.E.2d 825, are cited in support of the proposition that the appeal should be dismissed for lack of jurisdiction because of appellants' failure to place their assignment of errors in the transcript of the proceedings.

In *Scott Paper Company* an appeal from an order of the Public Service Commission was dismissed for lack of jurisdiction where the appellant failed to file an assignment of errors as required by IC 1971, 8–1–3–1 (Burns Code Ed.) and the Rules of Appellate Procedure. In ordering dismissal the court appears to have relied upon the decisions in *Moore v. Spann, supra,* where appellants failed to include in the transcript a certified copy of the motion to correct errors, and *Means v. Seif Material Handling Co.* (1973), 157 Ind.App. 492, 300 N.E.2d 895, where no assignment of errors was filed in

an attempted appeal from the Indiana Industrial Board.

▆ In dictum the *Scott Paper Company* majority observed that the jurisdictional requirement also required the inclusion of the assignment of errors in the transcript, expressly relying upon *Moore v. Spann.*

That statement was in error and *Scott Paper Company* should be restricted to those cases where no assignment of errors is timely filed.

*Moore v. Spann* should be distinguished. There the court was dealing with the failure of appellant to include in the transcript a certified copy of the motion to correct errors. Since the allegations of the motion to correct errors control the issues which may be considered on appeal in civil cases, it is reasonable to require a copy of the motion be presented in appellate review. Since the motion is filed with and ruled upon by the trial court it properly needs to be included in the transcript of the proceedings from that court.

▆ Such is not the case with an assignment of errors. It is neither filed with nor ruled upon by a trial court or administrative agency. It is *filed* with *this* Court. Its inclusion at the commencement of the transcript is a matter of convenience to this Court, and perhaps to the other parties. We realize that the same could be said of assignments of error under the old code practice before the adoption of the "new" rules.[8] The new rules were intended, however, to abrogate much of the technicality of prior practice. In the present case the appellants filed an appropriate assignment of errors with the clerk of this Court in the time permitted by the rules. We do not believe their failure to perform the mechanical task of inserting a copy of that assignment in the transcript warrants dismissal of the appeal or deprives this Court of jurisdiction.

as to enable the Commission to make the required findings of fact. IC 1971, 8–1–2–76 through 8–1–2–80 (Burns Code Ed.).

7. The pages with unnumbered lines consist mainly of pleadings, exhibits, etc., where a

copy of an original document is included in the record.

8. Several such cases holding the filing jurisdictional are cited in *Moore v. Spann.*

The two remaining allegations may be treated together.

In the adversary context within which our opinions are framed it is all too easy to ignore the thought that the primary purpose of the rules of appellate procedure is to provide instruction and a minimum standard of uniformity for the effective presentation of an appeal.[9]

Where the rule of law which may potentially be involved is one of waiver, rather than lack of jurisdiction, Judge Young's comment in dealing with the failure to file an appellee's brief has great substance:[10]

"[The] rule is for the benefit of the court and not the [parties]. We have discretion to invoke the rule."

 Our rules provide for marginal notations on pages of the transcript as well as numbered lines. AP. 7.2(A)(3). They also provide for pagination, AP. 7.2(A)(3); a table of contents in the transcript, AP. 7.1(C); and references in the brief to page and line where salient information is to be found, AP. 8.2(B)(5). The purpose of these provisions is to facilitate review and utilization of the transcript in determining the appeal.

It is, of course, true that opposing counsel may be disadvantaged in rebutting or explaining assertions advanced against his client where his opponent's failure to comply with these rules provides him with no ready access to the relevant parts of the record. Under such circumstances upon motion we may order rebriefing or that the defect in the form of the transcript be corrected. We may also, in the exercise of our discretion, deem the issue waived.

While this approach will no doubt leave open the door for occasional assertions of disparate treatment, it accords with the sound law approach rather than one which would encourage disregard of the rules or one of mechanical jurisprudence.

In the present appeal the defects advanced have not impaired our consideration of the issues. Summary affirmance was properly denied.

Affirmed.

GARRARD, P. J., and STATON, J., concur.

---

9. For example, appellate counsel who state the issue (see AP. 8.3(A)(3)) as "whether the trial court erred in denying the motion to correct errors" have satisfied their adversarial obligation, but have done little to inform the court or arouse its interest concerning the substance of the appeal.

10. *Contech Architects and Engineers v. Courshon* (1979), Ind.App., 387 N.E.2d 464, at 473.