# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2011

_____

| | | |
|---|---|---|
| City of Geneseo, Illinois, | * | |
| | * | |
| Plaintiff – Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Utilities Plus, | * | |
| | * | |
| Defendant – Appellee. | * | |

_____

Submitted: March 10, 2008
Filed: July 2, 2008

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

The City of Geneseo (City) appeals the district court's[1] adverse grant of summary judgment on its claims for breach of contract, unjust enrichment, promissory estoppel, and fraud against Utilities Plus (UP). We affirm.

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

I

The complex factual background of this case is set forth at length in the district court's opinion. City of Geneseo v. Utils. Plus, No. 05-2689, 2007 WL 1027294 (D. Minn. Apr. 3, 2007). Thus, we only briefly summarize those facts necessary for resolution of the issues before our court.

A

UP is a municipal joint powers organization under Minn. Stat. § 471.59, comprised of two municipal utility members: Central Minnesota Municipal Power Agency (CMMPA), and Midwest Municipal Gas Agency (MMGA). CMMPA sells wholesale power and related services, and MMGA sells natural gas, propane, fuel oil, and related services, each to member municipal utilities in Minnesota. CMMPA and MMGA entered into a Joint Powers Agreement, which established the entity UP with a joint Board of Directors and governing bylaws. UP's bylaws incorporate the provisions of Section 471.59, specify the number of officers and directors, and set procedures for Board meetings and financial distributions. UP's bylaws also provide for the election of a president, who "shall perform such duties as the Board of Directors may require, [and] shall have such authority as the Board of Directors may vest in him or her." The role and authority of UP's president is thus expressly determined and limited by its Board of Directors.

Section 471.59 provides, in relevant part, "[t]wo or more governmental units, by agreement entered into through action of their governing bodies, may jointly or cooperatively exercise any power common to the contracting parties or any similar powers." Minn. Stat. §471.59, subd. 1. In other words, the statute allows a combination of governmental units to exercise any powers the individual units already possess, all the while not creating any new powers.

In this case, CMMPA and MMGA are each municipal corporations "deemed to be performing an essential governmental function and exercising a part of the sovereign powers of the State of Minnesota." Minn. Stat. §§ 453.54, subd. 1 (municipal power agencies), 453A.04, subd. 1 (municipal gas agencies). As municipal agencies, the powers of each "shall be exercised by its board of directors, unless otherwise provided by agency agreement or bylaws." Id. Both agencies may only enter into contracts "on such terms and for such period of time as its board of directors determines." Minn. Stat. §§ 453.54, subd. 15, 453A.04, subd. 15. Both CMMPA and MMGA require the approval of their respective Board before either may buy, sell, exchange or transmit energy. Minn. Stat. §§ 453.54, subd. 16, 453A.04, subd. 16.

B

The parties stipulated they entered into a valid contract in 2002 for the interchange, transmission, sale, and purchase of electric capacity and energy. The agreement included two appendices, and provided for UP to sell energy to City on a cost-plus basis.[2] In late 2004, City decided to solicit bids for a fixed rate contract to replace its cost-plus arrangement with UP. In early 2005, City published a request for proposal for future energy rates and received three responses. One of the responses was from Don Kom – the President of UP – who began negotiating with City to provide energy at a fixed rate.[3] The fixed rate energy supply agreement was labeled Appendix 4 (A4) to the 2002 agreement and was drafted to become effective May 1, 2005. A4 contains blank signature blocks for the President of UP as well as for the

---

[2]UP would schedule and purchase the energy and transmission needed to serve City from multiple energy producers in the marketplace and bill City for it. The cost-plus rate was determined by UP's market cost to purchase and deliver the energy, plus an add-on for administration and overhead.

[3]Under a fixed rate contract, the prices to City would be certain. UP would bear the risk of any spike in energy prices.

Mayor of Geneseo. On March 29, 2005, Geneseo's City Council approved A4 and its companion capacity agreement A3, and authorized the Mayor to sign both documents on behalf of the city. No one from UP ever signed the documents.

In late April and early May 2005, City began to inquire why it had not received a signed copy of A4. On May 24, 2005, the City Administrator emailed Kom, "I didn't find an original copy of our energy agreement in the file. Has that cleared your Board and been executed yet?" Kom responded he was still working with the Board of Directors and lawyers, who had concerns about the agreement. He added, "I'm not at a point where I'm giving up yet! I'm looking at options."[4]

Energy prices spiked, and market rates soon exceeded the fixed rates set forth in A4. UP continued to operate under the original 2002 agreement and charged City according to the usual cost-plus pricing. When City objected, claiming the price terms of A4 governed, UP maintained A4 is not a valid contract because its Board of Directors never authorized the agreement.

City brought this suit to recover damages resulting from UP's refusal to sell it energy in accordance with A4's price terms. City alleged A4 was executed by Kom on behalf of UP and, thus, is binding. City asserted claims for breach of contract, unjust enrichment, promissory estoppel, conversion, coercion and fraud. The district court held Kom lacked actual and apparent authority to enter into the fixed rate energy agreement and found City's reliance on such authority was unreasonable as a matter of law. The court granted summary judgment to UP on all claims. City appeals the decision with respect to the breach of contract, unjust enrichment, promissory estoppel and fraud claims.

---

[4]At his deposition, Kom testified he had not discussed A3 or A4 with UP's legal counsel and never presented A4 to UP's Board of Directors for approval.

-4-

## II

We review the district court's grant of summary judgment de novo, applying the same standard the district court applied. Floyd v. State of Mo. Dep't of Soc. Serv., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999). Such is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c).

## III

"To prevail on a breach-of-contract claim, a plaintiff must show that a contract has been formed." Cargill Inc. v. Jorgenson Farms, 719 N.W.2d 226, 232 (Minn. Ct. App. 2006) (stating summary judgment is appropriate if a rational trier of fact could not find the existence of a contract). For the following reasons, we conclude A4 is not a binding contract and City's breach of contract claim fails as a matter of law.

## A

Don Kom did not have the actual authority to bind UP because he was not authorized by the Board of Directors to execute A4.

As is true of CMMPA and MMGA individually, we conclude UP must have the approval of its Board of Directors to enter into a contract, unless – as the rule with respect to its member utilities states – an agency agreement or bylaw provides otherwise. Under Minnesota law, an organization formed under a joint powers agreement can not exercise any power its members can not exercise individually. The Minnesota Supreme Court has explained, under Section 471.59, a joint powers organization "can exercise any power common to the contracting parties. Accordingly, the parameters of the group's [] powers are determined with reference

-5-

to the powers possessed by the individual participants . . . ." Joint Indep. Sch. Dist. No. 287 v. City of Brooklyn Park, 256 N.W.2d 512, 515 (Minn. 1977); see also Kaufman v. Swift County, 30 N.W.2d 34, 36-37 (Minn. 1947) (finding Section 471.59 grants governing bodies of merged municipalities the joint exercise of any power common to both). Similarly, the Office of the Attorney General for the State of Minnesota wrote, in an advisory opinion, a joint powers organization does not have the power to delegate authority that one member entity would not have the authority to delegate individually. Op. Att'y Gen. 1007 (July 8, 1977), 1977 WL 36271 at *3 (citing Op. Att'y Gen. 1007 (Nov. 21, 1975)).

Furthermore, the text of the authorizing statute itself states a joint powers organization, in exercising its shared powers, must comply with the law or rules governing each member of the joint powers organization. Minn. Stat. § 471.59. For example, subdivision three, which governs disbursement of funds, allows a joint powers organization to provide for disbursements from public funds as long as "the method of disbursement shall agree as far as practicable with the method provided by law for the disbursement of funds by the parties to the agreement." Id., subd. 3. Subdivision eleven, which governs the issuance of bonds or obligations, requires "[t]he obligations or other forms of indebtedness must be issued in the same manner and subject to the same conditions and limitations that would apply if the obligations were issued or indebtedness incurred by one of the governmental units that established the joint board." Id., subd. 11.

City argues the district court erred when it concluded all UP contracts needed to be approved by its Board of Directors. City concedes joint powers entities are recognized as hybrid entities, which can exercise any power similar to the power of its members. Id., subd. 1.; Reimer v. City of Crookston, 421 F.3d 673, 680 (8th Cir. 2005). However, City disputes the conclusion UP is subject to the same limitations as its member entities. There is no legal support for City's awkward argument. City erroneously relies on uncertainty in Minnesota courts regarding the precise legal form

of a joint powers organization in the context of liability cases. See, e.g., Matter of Greater Morrison Sanitary Landfill, SW-15, 425 N.W.2d 92, 96-97 (Minn. Ct. App. 1989) (finding governmental entities comprising a joint powers organization could be held individually liable for the actions of the organization, but avoiding the issue of whether to characterize the relationship between a joint powers organization and its members as principal-agent or a partnership). See also Reimer, 421 F.3d at 679-81 (recognizing uncertainty in Minnesota law, but holding a joint powers organization is to be treated like any other joint enterprise for purposes of imputing liability under Minnesota law and statutory liability caps should be the respective liability caps of each member entity rather than a single cap for the joint powers organization as an umbrella).

The two cases on which City relies do not aid its argument. First, they address the characterization of a joint powers organization for purposes of determining liability and are therefore inapposite. Second, to the extent they inform the relevant issue at all, they support our conclusion a joint powers organization shares the same rights and obligations as its member entities. In Reimer, we rejected the defendants' theory the Joint Recreation Board (a joint powers organization) limited the liability of its members by applying the statutory liability cap of $300,000 to the collective group. Instead, we found each member of the joint powers organization retained its separate liability as limited by the statutory cap, allowing plaintiffs to recover the statutory maximum from each. Id. at 679-80. In other words, the creation of a joint powers organization does not destroy the individual obligations of the member entities.

Based on the plain language of § 471.59 and relevant Minnesota case law, we conclude Minnesota law requires UP to obtain the approval of its Board of Directors before it may enter into a contract because neither CMMPA nor MMGA may enter into a contract without Board approval. City next argues there is a disputed issue of material fact as to whether the Board authorized Kom to enter into contracts on its

behalf, and as to whether the Board itself approved A4. The record contains no credible evidence to support either claim. No clause in the Joint Powers Agreement, UP's bylaws, or resolution of UP's Board of Directors provides Kom with the authority to bind UP. No record evidence shows UP's Board actually approved A4. In fact, the record reflects the opposite. On May 25, 2005, almost a month after A4 would have gone into effect, Kom reported to City the Board had not yet approved it.

Kom did not have actual authority to bind UP because the Board of Directors did not authorize him to do so. As there is no *genuine* dispute over whether UP's Board of Directors approved the A4 contract with City, it is not an enforceable contract.

B

Don Kom did not have apparent authority to bind UP because the apparent authority doctrine does not apply to UP.

City argues because Minnesota law does not expressly provide a joint powers organization cannot be bound by an agent's apparent authority, UP is liable under the doctrine of apparent authority. We are not persuaded. UP is comprised of two municipal agencies and, under Minnesota law, apparent authority doctrines do not apply to municipal agencies. Jewell Belting Co. v. Village of Bertha, 97 N.W. 424, 425 (Minn. 1903) ("All persons contracting with municipal corporations are conclusively presumed to know the extent of the authority possessed by the officers with whom they are dealing."). As explained in Part III.A., supra, under Section 471.59, a joint powers organization can exercise any power common to the contracting parties. Joint Indep. School Dist. No. 287, 256 N.W.2d at 515 (Minn. 1977); Kaufman, 30 N.W.2d at 36-37 (Minn. 1947); Op. Att'y Gen. 1007 (July 8, 1977), 1977 WL 36271 at *3 (stating a joint powers organization does not have the joint power to delegate authority that one member entity would not have the authority

-8-

to delegate individually). Thus, for the same reason the doctrine of apparent authority can not apply to one of the municipal agencies comprising UP, it can not apply to UP either. As a matter of law, City could not have reasonably relied on any representations of Kom as to his authority to bind UP. See Plymouth Foam Prods., Inc. v. City of Becker, 944 F. Supp. 781, 785 (D. Minn. 1996) (applying Minnesota law and holding no contract was ever formed between plaintiff and the city because the city's community development director had no authority to bind the city and plaintiff could not rely on his apparent authority); Morris v. Perpich, 421 N.W.2d 333, 336 (Minn. Ct. App. 1988) (explaining, although plaintiffs may have believed county administrator had the requisite authority to enter into the agreement on behalf of the county, apparent authority is insufficient).

We are also unpersuaded by City's argument UP may be bound under the doctrine of apparent authority because, by selling energy, it was acting in a proprietary rather than governmental capacity. First, the distinction between proprietary and governmental activities is not relevant in this context. Minnesota law expressly limits the authority of any agent to contractually bind a city, county, or – in this case – a municipal agency without council or board approval, regardless of any such proprietary-governmental distinction. See Minn. Stat. §§ 412.201 (cities), 373.02 (counties), 453.54 (municipal power agencies), 453A.04 (municipal gas agencies). Second, by carrying out their purpose to assist Minnesota cities in securing "an adequate, economical, and reliable supply of energy," Id. § 453.51, CMMPA and MMGA are each, by statute, "deemed to be performing an essential governmental function and exercising a part of the sovereign powers of the State of Minnesota." Id. §§ 453.54, subd. 1 (municipal power agencies), 453 A.04, subd. 1 (municipal gas agencies).

Thus, as a matter of law, City may not rely on Kom's apparent authority. Because Kom did not have the authority – actual or apparent – to bind UP, A4 is not

an enforceable contract.  Summary judgment in favor of UP was therefore appropriate on the breach of contract claim.

C

The doctrine of equitable estoppel does not apply.

City next argues even if A4 is not an enforceable contract, UP is nonetheless liable under the doctrine of equitable estoppel.  Equitable estoppel applies to prevent a party from denying the truth of representations of fact previously made where the following requirements are met:

(1) There must be a misrepresentation of a material fact;
(2) The party to be estopped must be shown to have known that the representation was false;
(3) The party to be estopped must have intended that the representation be acted upon;
(4) The party asserting the estoppel must not have had knowledge of the true facts; and
(5) The party asserting the estoppel must have relied upon the misrepresentation to his detriment.

Transamerica Ins. Group v. Paul, 267 N.W.2d 180, 183 (Minn. 1978).  As the district court pointed out, the record does not contain any evidence Kom told anyone at City he could contract without the approval of UP's Board of Directors.  There is also no evidence Kom stated UP's Board had approved A4.  The record shows the Mayor of Geneseo signed A4 on behalf of City, but no one representing UP ever did.  Although A4 contains a May 1 start date, City sent an email to Kom on May 24, inquiring whether UP's board had approved and executed the contract yet.  Kom replied it had not.  The district court correctly concluded the record could not support a finding of equitable estoppel  on these facts.  See Plymouth Foam Prods., Inc., 944 F. Supp. at 785-86 (holding the City could not be equitably estopped from asserting there was no

contract because plaintiff was on notice officials had no authority to contract on behalf of city without approval and there was no evidence any city official advised plaintiff to the contrary).

IV

City's promissory estoppel claim fails because, as a matter of law, it was unreasonable for City to rely on a promise from Kom, when it is conclusively presumed to know the limited extent of his authority.

The doctrine of promissory estoppel implies a contract in law where none exists in fact. Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000). It requires proof of: (1) a clear and definite promise; (2) the promisor intended to induce reliance and such reliance occurred; and (3) the promise must be enforced to prevent injustice. Olson v. Synergistic Techs. Bus. Sys., Inc., 628 N.W.2d 142, 152 (Minn. 2001). The injustice factor is a question of law the court must decide. Faimon v. Winona State Univ., 540 N.W.2d 879, 883 (Minn. Ct. App. 1995). The reasonableness of a promisee's reliance is one consideration when determining injustice. Id. "Whether a party's reliance is reasonable is ordinarily a fact question for the jury unless the record reflects a complete failure of proof." Hoyt Props., Inc. v. Prod. Res. Group, L.L.C., 736 N.W.2d 313, 321 (Minn. 2007). Here, as discussed in Part III.B., supra, as a matter of law, City could not have reasonably relied on any promise made by Kom because he had no authority to bind UP. See Nicollet Restoration, Inc. v. City of St. Paul, 533 N.W.2d 845, 848 (Minn. 1995) (holding plaintiff could not reasonably rely on promises made during negotiations with the mayor and other government official because neither had authority to bind the city). Therefore, the district court did not err when it granted summary judgment to UP on the promissory estoppel claim.

## V

City cannot prevail on its fraud claim for the same reason. It was unreasonable, as a matter of law, for City to rely on any representation by Kom of his authority to bind UP.

City argues UP engaged in fraud when Kom misrepresented UP's intention to offer a fixed price contract at the levels specified in A4 and, in reliance, City allowed proposals from other energy providers to expire. To prevail on its fraud claim, City must establish:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge;
> (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false;
> (3) with the intention to induce another to act in reliance thereon;
> (4) that the representation caused the other party to act in reliance thereon; and
> (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

Hoyt Props., 736 N.W.2d at 318. City must set forth evidence demonstrating both actual and reasonable reliance. Id. at 320. "Whether a party's reliance is reasonable is ordinarily a fact question for the jury unless the record reflects a complete failure of proof." Id. at 321. Here, as a matter of law, City could not have reasonably relied on Kom's representations because he lacked authority to bind UP. Therefore, the district court properly granted summary judgment to UP on the fraud claim.

## VI

City cannot prevail on its unjust enrichment claim because it cannot prove it is entitled to the rates specified in A4.

-12-

City's claim for unjust enrichment depends on UP unjustly receiving a benefit, which properly belonged to City. "To establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled and that the circumstances are such that it would be unjust for that person to retain the benefit." Mon-Ray, Inc. v. Granite Re, Inc., 677 N.W.2d 434, 440 (Minn. Ct. App. 2004). City alleges UP unjustly received the benefit of cost-plus payments after May 1, 2005, rather than the lower fixed rates specified in A4. For the reasons outlined in this opinion, City cannot prove it is entitled to those rates. Therefore, the district court did not err when it granted summary judgment to UP on the unjust enrichment claim.

## VII

For the foregoing reasons, as well as those stated by the district court, we conclude summary judgment was proper on each of City's claims. Accordingly, we affirm.

_____