## No. 25422

**City and County of Denver, a municipal corporation v. Public Utilities Commission of the State of Colorado**
(507 P.2d 871)

Decided February 26, 1973.                    Rehearing denied April 2, 1973.

Max P. Zall, City Attorney, Brian H. Goral, Assistant, for plaintiff-appellee.

Duke W. Dunbar, Attorney General, John E. Archibold, Assistant, Irvin M. Kent, Assistant, for defendant-appellant.

John J. Conway, for amicus curiae, Colorado Rural Electric Association.

MR. JUSTICE KELLEY delivered the opinion of the Court.

This litigation grows out of the determination by the City and County of Denver (Denver) to acquire the property and operating rights of The Denver Tramway Corporation (Tramway). The trial court enjoined the Public Utilities Commission (P.U.C.) from exercising jurisdiction over the operation by Denver of the mass transit system in the

metropolitan Denver area *outside* the territorial limits of Denver.

By agreement of the parties, the sole issue presented for determination is whether and to what extent the P.U.C. has jurisdiction to regulate the service and rates of the mass transit system outside the territorial boundaries of the city. It is universally agreed that the P.U.C. has no jurisdiction to regulate or control the operation of a municipally owned utility which operates wholly *within* the territorial boundaries of a home rule city, such as Denver. Article XX, Sections 1 and 5, and Article XXV, Constitution of Colorado.

We permitted the Colorado Rural Electric Association to file an amicus curiae brief because of the alleged effect the ruling of the trial court, which is here challenged, would have on its members if the ruling were to stand.

A summary statement of the background out of which this issue developed is necessary to an understanding of the respective positions of the contestants.

I.

Denver, by charter amendment, voted to acquire a public transportation system, "solely within or both within and without the corporate limits" of the city and pursuant thereto initiated proceedings to acquire by condemnation the property of the Denver Tramway Corporation, including its Certificates of Public Convenience and Necessity No. 210 and No. 7099.

Proceedings to condemn were initiated and on April 13, 1971, the Denver District Court ordered all of the Tramway assets transferred to Denver. Pursuant to this order, Denver and Tramway applied to the P.U.C. for transfer of Certificates P.U.C. No. 210 and P.U.C. No. 7099.

P.U.C. No. 210 is the authority for Tramway to conduct a public transportation service in areas of Denver, Adams, Arapahoe and Jefferson Counties (the Denver metropolitan area). P.U.C. No. 7099 is the authority for Denver Tramway Charter Co. (a wholly owned subsidiary of Tramway) to conduct charter bus service throughout the state of Colorado.

P.U.C. No. 7099 is not in issue and will receive no further specific mention.

On April 16, 1971, Denver and Tramway applied to the P.U.C. for transfer of the two certificates from Tramway to Denver, and for temporary and emergency authority for Denver to conduct operations under the certificates pending hearings on the applications and the granting of permanent transfers. Denver was granted emergency authority to operate until May 3, 1971.

On April 30, 1971, temporary authority to operate under the two certificates was extended 165 days or until the granting of the permanent transfer, conditioned on Denver's full compliance with all statutory and regulatory requirements.

II.

Following the public hearings on the transfer applications and pending a P.U.C. decision, Denver, without prior notice, filed a motion to withdraw its application to transfer P.U.C. No. 210, relating to mass transit in the metropolitan Denver area.

On September 24, 1971, P.U.C. denied Denver's motion to withdraw its application in reference to P.U.C. No. 210 and approved the transfer of both certificates to Denver. Denver's petition for rehearing was denied.

Prior to September 24, 1971, Denver modified its service under P.U.C. No. 210 to patrons living *outside* its territorial limits, because it was losing money and the counties and cities involved would not agree to contribute to the subsidization of the operation for the benefit of their residents. Among the complaints received by the P.U.C. because of this service stoppage was one from a Mrs. Arthur Ware of 8341 — 52nd Avenue, Arvada, Jefferson County. This complaint was received on September 8, 1971. Mrs. Ware, wholly dependent on public transportation to obtain the necessities of life, had used the Tramway bus service (Route 83 — Olivet) for over 15 years.

On the basis of Mrs. Ware's complaint, the P.U.C. issued an order to Denver to show cause why the P.U.C. should not

take appropriate action to force Denver to comply with its certificated authority. Following this hearing, Denver filed the motion to withdraw its application for P.U.C. No. 210 on the ground that the P.U.C. lacked jurisdiction to act in the premises.

On September 24, 1971, P.U.C. determined that it had jurisdiction over Denver under P.U.C. No. 210 as to bus service outside the corporate limits of the city, and ordered Denver to restore the bus service outside Denver on Route 83 - Olivet. Denver's petition for rehearing was denied.

Review proceedings in the district court followed which resulted in the holding that the P.U.C. "has no jurisdiction over the operation of the Denver Metro Transit System." The P.U.C. has appealed that ruling to this court. We disagree with the trial court and reverse.

The trial judge in his findings of fact pinpointed the issue when he noted that:

"The law of the State since September 13, 1926, as decided in *City of Lamar vs. Town of Wiley,* 80 Colo. 18, was that the Public Utilities Commission had jurisdiction over municipally owned public utilities furnished by a municipality to consumers outside its territorial boundaries to the same extent that the Public Utilities Commission had control and supervision over private public utilities,"

but then found that it was the intention of the people of Colorado, as evidenced by the adoption in 1954 of Article XXV of the Constitution of Colorado, to change the law

"to exclude municipally owned public utilities from the control and supervision of the Public Utilities Commission *outside* the municipality's territorial limits." (Emphasis added.)

The court concluded its findings by this observation,

"The language of Article XXV is plain and unambiguous and needs no interpretation."

Because frequent references will be made to the amendment, the full text appears here:

"In addition to the powers now vested in the General Assembly of the State of Colorado, all power to regulate the

facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor *within home rule cities and home rule towns,* of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate. (Emphasis added.)

"Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities."

■ The last clause, "that nothing herein shall be construed to apply to municipally owned utilities," gives rise to the interpretive difference which exists between the trial court and this court as to the extra territorial power of cities to regulate "facilities, service, rates and charges therefor."

The question for resolution is: Was it the intent of the amendment, as the trial judge suggests, to change the law as stated in *City of Lamar v. Town of Wiley,* 80 Colo. 18, 248 P. 1009 (1926), which recognized the jurisdiction of the General Assembly (ultimately to the P.U.C.) over municipal utilities *outside* the territorial boundaries of the city; or was it the intent to grant to the General Assembly authority to regulate public utilities operating *within* the territorial boundaries of home rule cities?

On the basis of the history of decisions in the context of the constitution as it existed prior to the 1954 amendment, we conclude that the purpose of the change was to grant to the General Assembly the authority to regulate privately owned public utilities *within* home rule cities. Without the grant of such power the regulation of service among the

inhabitants of the city was a *local matter,* and laws of the state in conflict with ordinances and charter provisions enacted pursuant to Article XX had no force and effect within the municipality.

In 1924, the rationale and justification for home rule of municipally owned utilities operating *wholly within the municipality,* was enunciated in *Town of Holyoke v. Smith,* 75 Colo. 286, 226 P. 158 (1924), in this paragraph:

"On principle it would seem entirely unnecessary to give a commission authority to regulate the rates of a municipally owned utility. The only parties to be affected by the rates are the municipality and its citizens, and, since the municipal government is chosen by the people, they need no protection by an outside body. If the rates for electric light or power are not satisfactory to a majority of the citizens, they can easily effect a change, either at a regular election, or by the exercise of the right of recall."

In 1926 this court decided *City of Lamar v. Town of Wiley, supra,* which the trial judge suggests was the target of Article XXV. In this decision we held:

"Both upon authority and reason a municipally owned public utility, as to service furnished consumers beyond its territorial jurisdiction, should be as already stated, subject to the same regulation to which a privately owned public utility must conform in similar circumstances."

*See also P.U.C. v. City of Loveland,* 87 Colo. 556, 289 P. 1090 (1930).

Chronologically, the next case decided by this court was *Englewood v. Denver,* 123 Colo. 290, 229 P.2d 667 (1951). Denver argues that there is no difference in principle between a water utility and a bus system and that in applying the *Englewood* reasoning, Denver is not subject to P.U.C. regulation for its *outside* service. The court, in the course of the opinion, mentioned *City of Lamar v. Town of Wiley, supra,* but, instead of overruling it, explained several different reasons why it had no application. We regard *Englewood v. Denver, supra,* as still the law as it relates to the particular situation with which it was dealing, but do not regard it as in

conflict with or as having overruled *Lamar v. Wiley, supra.*

It appears to us that *Lamar v. Wiley* was the law in this state at the time Article XXV was adopted and we find nothing in the language of the amendment which suggests that it was designed or intended to modify the law of *Lamar v. Wiley.*

The amendment begins,

"*In addition to the powers now vested* in the General Assembly, *all power to regulate* the facilities . . . *within home rule cities, . . . of every corporation, . . . operating within the State of Colorado, . . . as a public utility, . . .* is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate,"

and after designating the P.U.C. as that agency until another designation is made, it finally provides,

"that nothing herein shall be construed to apply to municipally owned utilities."

The "nothing herein" had to do with the granting of power to the P.U.C. to regulate *public utilities within* the corporate boundaries of *home rule cities,* but it did not take away the power of home rule cities to regulate (their own) *municipal utilities within* the corporate boundaries of the home rule municipality.

The first paragraph very clearly grants to the General Assembly the power to regulate *public utilities within home rule cities,* a power which, since the adoption of Article XX, had belonged exclusively to home rule cities where the utility was local in use and extent. It was not *local* in nature and extent but state-wide in *People ex rel. P.U.C. v. Mountain States Tel. & Tel. Co.,* 125 Colo. 167, 243 P.2d 397 (1952), where we held that the P.U.C. had jurisdiction to set rates *within* the municipality. This overruled *Denver v. Mountain States Tel. & Tel. Co.,* 67 Colo. 225, 184 P. 604 (1919).

The last clause of the second paragraph of the amendment, "that nothing herein shall be construed to apply to municipally owned utilities," was capitalized by the trial court in its judgment and decree, indicating that this language received special emphasis by the court in arriving at its

conclusion that the amendment was intended "to change the existing law to exclude municipally owned public utilities from the control and supervision of the Public Utilities Commission outside the municipality's territorial limits."

This interpretation constitutes the crux of our disagreement with the trial court. The last clause merely says in effect that although the power to regulate *public utilities* within home rule cities is transferred to the General Assembly, there is no intention to give the General Assembly authority to regulate a *municipally* owned utility *within* the corporate limits of the municipality.

If Denver determines to operate its mass transit system *outside* of the territorial boundaries of Denver, it is subject to the jurisdiction of the P.U.C. There is a distinction between municipal and non-municipal utilities. It is fully recognized that, when an operation outside the municipality can be operated only at a loss, there are competing public interests, *i.e.,* those of the taxpayers of the city, and those who reside outside the city and need the service. *See Wylde v. City of Seattle,* 162 Wash. 583, 299 P. 385 (1931). Considerable — but not necessarily conclusive — weight should be given to the equities favoring the city.

The Commission with its expertise undoubtedly can add flesh to the skeleton so generally constructed above. The courts can review future rulings of the Commission to determine if it has abused its discretion. Also, there may be areas here in which the General Assembly can furnish some guidelines.

The judgment of the trial court is reversed and the cause is remanded for further proceedings not inconsistent with the views expressed herein.

MR. CHIEF JUSTICE PRINGLE concurs in result only.