Harry Galligan Executive Secretary Public Utilities Commission 1525 Sherman Street Denver, CO 80203
Dear Mr. Galligan:
This opinion letter is in response to your letter of January 31, 1980, in which you requested my opinion of the constitutionality of House bill No. 1135 (1980 Sess.), hereinafter referred to as H.B. 1135. Originally I responded by an attorney general's opinion dated February 14, 1980. That opinion was placed under reconsideration in view of requests by the Office of the Governor and a member of the Colorado House of Representatives. Upon reconsideration, my February 14, 1980 opinion letter is withdrawn and this opinion letter is issued in its place.
H.B. 1135 provides as follows:
 Be it enacted by the General Assembly of the State of Colorado:
 SECTION 1. 40-4-106, Colorado Revised Statutes 1973, is amended BY THE ADDITION OF A NEW SUBSECTION TO READ:
 40-4-106. Rules for public safety-crossings — allocation of expenses.
 (4) When a political subdivision requests the approval of an expansion of a public highway at a railroad crossing within such political subdivision, the commission shall authorize such expansion, including the alteration or relocation of safety signals and devices as are necessary, and shall allocate the full cost thereof to the political subdivision in interest when:
 (a) The political subdivision in interest has passed an ordinance or resolution authorizing the expansion of the public highway at the crossing from two to four lanes;
 (b) Such political subdivision has passed an ordinance or resolution authorizing the issuance of bonds to finance the expanded crossing; and
 (c) The crossing is used by an average of over five thousand motor vehicles per day.
 SECTION 2. Safety clause: The general assembly hereby finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health and safety.
QUESTION PRESENTED AND CONCLUSION
Your request for an attorney general's opinion presents a single broad question:
Whether House bill No. 1135 violates article XXV of the Colorado Constitution?
 My conclusion is "yes." It is my opinion that H.B. 1135 violates the spirit and intent of the people of Colorado in adopting article XXV of the Colorado Constitution.
ANALYSIS
In reaching this conclusion, I have addressed the following narrow questions:
1. What entities are included within the definition of "political subdivision" as that term is used in the bill?
2. What effect would H.B. 1135 have upon the regulatory power of the Public Utilities Commission and the regulatory power of political subdivisions?
3. Is the effect which H.B. 1135 would have upon the regulatory power of the Public Utilities Commission and the regulatory power of political subdivisions allowed by article XXV of the Colorado Constitution?
 H.B. 1135 provides that, when a political subdivision applies to the Public Utilities Commission (hereinafter the "commission") for expansion of a public highway at a railroad crossing located within the boundaries of the political subdivision, the commission shall authorize the expansion when certain conditions are met. The prerequisite conditions are: a) passage by the political subdivision of ordinances or resolutions authorizing expansion of the crossing from two to four lanes and authorizing the issuance of bonds to finance the crossing; and (b) use of the crossing by an average of over five thousand motor vehicles per day.
4. What entities are included within the definition of "political subdivision" as that term is used in H.B. 1135?
 H.B. 1135 does not provide a definition of "political subdivision." However, the Colorado Supreme Court has considered the use of that term and, although it has not to my knowledge provided a conclusive definition, the court has listed certain entities that qualify as political subdivisions, i.e., cities, counties, towns and school districts. Northern Colorado Water Conservancy District v. Witwer, 108 Colo. 307, 116 P.2d 200, 201 (1941). What, if any, other entities fall within the definition of a political subdivision is unclear. See Northern Colorado Water Conservancy District v. Witwer, supra. The lack of clarity regarding the definition of political subdivision is of little importance other than to note that home-rule cities would be included within that term. The importance of this fact will be developed further below.
5. What effect would H.B. 1135 have upon the regulatory power of the Public Utilities Commission and the regulatory power of political subdivisions?
 H.B. 1135 clearly would limit or restrict the power of the commission under the conditions and to the extent set forth in the bill. Indeed, the general assembly has the power to restrict the authority of the commission and, if the sole effect of H.B. 1135 was to restrict the authority of the commission, the bill would not offend article XXV of the constitution. See, e.g., Mountain States Legal Foundation v. Public Utilities Commission, 197 Colo. 56, 590 P.2d 495 (1979); Mountain States Telephone Telegraph Co. v. Public Utilities Commission, 195 Colo. 130, 576 P.2d 544 (1978); Miller Bros., Inc. v. Public Utilities Commission, 185 Colo. 414, 525 P.2d 443 (1976). On first blush, the effect of the bill appears confined to such a restriction. However, upon closer examination, it becomes apparent that the effect of the bill is greater than a mere limitation upon the power of the commission.
 Under the guise of restricting commission power, H.B. 1135 allows political subdivisions to regulate certain aspects of public utilities. H.B. 1135 has the effect of both limiting the exercise of commission power and simultaneously granting regulatory authority over rail utilities to political subdivisions. Subject essentially only to the condition that 5,000 motor vehicles use the crossing each day and that the political subdivision finance the expansion of a crossing, a political subdivision would be empowered by this bill to take utility property and to affect a utility's operations in the critical area of safety of operations.
 C.R.S. 1973, 40-4-106 implicitly recognizes that the issue of public safety is inextricably related to the design, location, construction and signalization of railroad crossings. Indeed, all commission power derived from C.R.S. 1973, 40-4-106 is intended by the terms of the statute to promote public safety. Moreover, safety of rail operations is related directly to a railroad's operating expenses which, in turn, affect both the service provided and the fares and charges for that service.
 H.B. 1135 clearly removes from the commission the power to determine whether expansion of a railroad crossing is consistent with public safety. That question is, ipso facto, left to the determination of political subdivisions. By virtue of application for an expanded crossing, a political subdivision will have effectively determined at the very least that the expansion of a given crossing is not harmful to public safety. From the critical aspect of public safety, if from no other, under H.B. 1135 political subdivisions will have the power to regulate the operations of railroad utilities operating within the boundary of the political subdivision.
6. Is the effect which H.B. 1135 would have upon the regulatory power of the Public Utilities Commission and the regulatory power of political subdivisions allowed by article XXV of the Colorado Constitution?
Article XXV provides as follows:
 In addition to the powers now vested in the General Assembly of the State of Colorado, all power to regulate the facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor within home rule cities and home rule towns, of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate.
 Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities.
Article XXV vests the power to regulate the facilities, service, rates and charges of public utilities in the Public Utilities Commission until such time as the general assembly chooses to designate another state agency to exercise such power(s).[1] (Footnote appears following the text of this opinion.)
In analyzing the general assembly's authority to transfer or divert regulatory powers over railroad crossings from the Public Utilities Commission, the focus of inquiry falls upon the phrase "such other agency of the State of Colorado" appearing in the first paragraph of article XXV. If the political subdivisions referred to in H.B. 1135 qualify as an "agency of the State of Colorado" within the intendment of article XXV, then the general assembly may designate them to regulate public utilities.
However, if any of the entities included within the definition of a political subdivision does not qualify as an "agency of the State of Colorado" within the intendment of the article, such entity can not, by legislative action alone, be empowered to exercise regulatory power over public utilities.
In my opinion, the adoption of article XXV of the constitution manifests an intent on the part of the people of this state to divest home rule municipalities of regulatory power over public utilities. Because home rule municipalities are clearly a form of political subdivision, I have reached the conclusion that article XXV prohibits the designation of political subdivisions to exercise regulatory power over public utilities.
In reaching my conclusion regarding the meaning of article XXV, I have employed widely recognized principles for the construction and interpretation of constitutional provisions. The application of these principles is appropriate in this analysis because the meaning of article XXV is not altogether plain and unambiguous.
Constitutional provisions are to be construed so as to give effect to the intent of the framers. See McCullochv. Maryland, 17 U.S. 316, 4 L.Ed. 579 (1819); Whitmanv. National Bank of Oxford, 176 U.S. 559, 20 S.Ct. 477,44 L.Ed. 58 (1960). In determining the meaning and intent of a particular constitutional provision, it is appropriate to "consider its historical background, the conditions existing when it was adopted, and what were the mischiefs against which it was intended to guard." Town of Holyoke v. Smith,75 Colo. 286, 226 P. 158 (1924).
Prior to the adoption of article XXV, the question of whether the operations of a public utility were a local matter subject to local control or a matter of statewide concern subject to control by the general assembly was essentially an open question, decided on a case by case basis. See, e.g.,Mountain States Telephone Telegraph Co. v. PublicUtilities Commission, 125 Colo. 167, 243 P.2d 397 (1952). In Mountain States Telephone Telegraph Co.,supra, the Colorado Supreme Court characterized separate regulation by cities as well as by the PUC as unreasonable:
 While the authority of the state to regulate the Telephone Company is unquestioned, such regulation must be reasonable and it seems to us grossly unreasonable to subject a telephone company to separate regulation by as many agencies as there are home rule cities operating in the state, and in addition thereto to provide regulation outside home rule cities by the Public Utilities Commission.
Id. at 243 P.2d 402.
Article XXV of our state constitution was adopted only 2 years after this supreme court pronouncement. Once and for all, it ended the debate regarding whether the regulation of public utilities operating within home rule cities was a "local and municipal matter" or "a matter of statewide concern." Clearly, the regulation of public utilities became, by virtue of article XXV, a matter of statewide concern. See PublicUtilities Commission v. City of Durango, 171 Colo. 553,469 P.2d 131, 134 (1971) (Kelley, J., concurring opinion). In City and County of Denver v. Public UtilitiesCommission, 181 Colo. 38, 507 P.2d 871 (1973), our supreme court reviewed the historical context underlying the adoption of article XXV. The court found that the effect of article XXV was to transfer from home rule cities to the general assembly the power to regulate public utilities operating within home rule cities. Id. at 507 P.2d 875. Justice Kelley, writing for the majority, stated:
 On the basis of the history of decisions in the context of the constitution as it existed prior to the 1954 amendment, we conclude that the purpose of the change was to grant to the General Assembly the authority to regulate privately owned public utilities within
home rule cities. Without the grant of such power the regulation of service among inhabitants of the city was a local matter, and laws of the state in conflict with ordinances and charter provisions enacted pursuant to Article XX had no force and effect within the municipality.
Id. at 507 P.2d 873. (Emphasis in original.)
Both the purpose and the effect of article XXV was to withdraw from municipalities the power to regulate the facilities, services, rates, and charges of public utilities that are not municipally owned. A direct delegation of regulatory authority by the general assembly, then, to home rule cities and towns would directly violate that purpose and negate that effect. Similarly, an indirect delegation of regulatory authority to home rule cities and towns would have the effect of evading the purpose of article XXV of the constitution. And, a state constitution may not be construed in such a way as to permit an evasion of it.See, e.g., Sheehy v. Shinn,103 Cal. 325, 37 P. 393 (1894).
Although H.B. 1135, on its face, does not directly violate article XXV, it permits evasion of both the purpose and effect of the article by restricting the jurisdiction of the Public Utilities Commission in favor of the exercise of the will of home rule municipalities. Because a constitutional provision should be construed so as to suppress the mischief at which it was aimed, rather than so as to defeat its evident purpose, a municipality, in my opinion, is not "an agency of the State of Colorado" as intended by article XXV of the constitution. Accordingly, the general assembly may not designate any municipality as a political subdivision to exercise regulatory powers over public utilities. See generally,e.g., Jarrolt v. City of Moberly,103 U.S. 580, 586, 26 L.Ed. 492 (1881); People v.Y.D.M., 197 Colo. 403, 593 P.2d 1356, 1359 (1979);Colorado State Civil Service Employees Associationv. Love, 167 Colo. 436, 448 P.2d 624, 629 (1968).
I specifically have not determined whether article XXV was intended to limit the general assembly's power to designate a single agency (as distinguished from several different agencies) to regulate utilities. Nor have I attempted to determine each of the entities or the kind of entities which qualify as an "agency of the State of Colorado" under article XXV. Such determinations are unnecessary to this opinion in light of my conclusion that the purpose of article XXV was to divest home rule cities of regulatory power over public utilities. Also, this opinion does not address the question to what extent or under what standards the general assembly may restrict or transfer regulatory power over public utilities in view of article XXV of the Colorado Constitution.
SUMMARY
To briefly summarize my opinion, H.B. 1135, if enacted into law, would indirectly delegate to local governmental units authority to regulate public utilities operating within their boundaries. As such, H.B. 1135 is contrary to the purpose and effect of article XXV of the Colorado Constitution. The general assembly may not, by legislative enactment, contravene the expressed will of the people of Colorado as embodied in the state constitution.
Very truly yours,
 J.D. MacFARLANE Attorney General
HIGHWAYS
SAFETY
COSTS
H.B. 1135 (1980)
C.R.S. 1973, 40-4-106(1)
Colo. Const. art. XXV
REGULATORY AGENCIES, DEPT.
Public Utilities Comm.
H.B. 1135 (1980) violates art. XXV of the Colorado Constitution.
[1] Significantly, the second paragraph of article XXV leaves unaffected the power of municipalities to exercise reasonable police, licensing, and franchising powers. This paragraph also specifically excludes municipally owned utilities operating within municipal boundaries from commission regulation. SeeCity and County of Denver v. Public UtilitiesCommission, 181 Colo. 38, 507 P.2d 871 (1973). In addition, cases have drawn a distinction between the power to regulate facilities, services and rates and charges therefor, which is vested in the commission by the first paragraph of article XXV, and the power of municipalities to enact reasonable zoning and land use regulations, which the second paragraph excludes from P.U.C. jurisdiction. See City of Englewood v.Mountain States Telephone Telegraph Co., 163 Colo. 400,431 P.2d 40 (1967). Tri-State Generation TransmissionAssoc., Inc. v. Board of County Commissioners,42 Colo. App. 479, 600 P.2d 103 (1979). The power of municipalities to enact reasonable zoning regulations appears to be unaffected by the provisions of article XXV.