**DURANGO TRANSPORTATION, INC., Plaintiff–Appellant,**

v.

**CITY OF DURANGO, The Board of County Commissioners of the County of La Plata and Durango Transit Advisory Board, Defendants–Appellees.**

No. 88CA0165.

Colorado Court of Appeals,
Div. II.

Aug. 1, 1991.

Rehearing Denied Sept. 5, 1991.

Certiorari Denied Jan. 27, 1992.

Law Office of Nancy P. Bigbee, Nancy P. Bigbee, Denver, for plaintiff-appellant.

Smith & West, David P. Smith, Durango, for defendants-appellees.

Gerald E. Dahl, Denver, for amicus curiae Colorado Mun. League.

Opinion by Judge DAVIDSON.

This case comes before us on remand from the Colorado Supreme Court for consideration of whether the intergovernmental agreement between the City of Durango and the County of La Plata is valid. Since we conclude the agreement is valid, we affirm the judgment of the trial court.

This action arose out of an intergovernmental agreement between the City of Durango (City) and La Plata County (County) which provided that the City would operate a mass transit system between areas in the City and the County. Pursuant to this agreement, the City establishes fares with advice and recommendation from the Transit Advisory Board which is made up of both City and County appointees.

Durango Transportation, Inc., (DTI) a private corporation which has authority from the Public Utilities Commission (PUC) to operate a mass transit system within the County, brought this action alleging that the defendants, the City, the County, and the Advisory Board, were infringing upon this authority. Among other things, DTI argued that the City could not operate beyond its jurisdiction without PUC authority and, thus, that the agreement which purports to allow such an operation is invalid.

The trial court dismissed DTI's complaint, holding that the PUC had no jurisdiction over the City and County's joint operation of a mass transit system within the County. Implicit in this holding was the finding that in operating a mass transit system, both the City and the County were operating as municipalities and were, therefore, exempt from PUC regulation when operating inside their respective boundaries. This court reversed the trial court's ruling on that issue, finding that counties were not municipalities and, therefore, were not exempt from PUC authority. *Durango Transportation, Inc. v. City of Durango,* 786 P.2d 428 (Colo.App.1989). That judgment was reversed by the Colorado Supreme Court which determined that the County here was functioning as a municipality in operating a transit system and was, thus, exempt from PUC jurisdiction when performing this activity within its boundaries. *City of Durango v. Durango Transportation, Inc.,* 807 P.2d 1152 (Colo. 1991).

On remand the sole remaining issue to be addressed is whether the intergovernmental agreement between the City and the County is valid.

### I.

■ DTI first contends that the agreement is unlawful under the Colorado Constitution and statutory law. We disagree.

The constitutional provision governing intergovernmental agreements, Colo. Const. art. XIV, § 18(2)(a), provides as follows:

"Nothing in this constitution shall be construed to prohibit the state or any of its political subdivisions from cooperating or contracting with one another or with the government of the United States to provide any function, service, or facility lawfully authorized to each of the cooperating or contracting units, in-

cluding the sharing of costs, the imposition of taxes, or the incurring of debt."

Similarly, the enabling statutory provision regarding such agreements states:

"Governments may cooperate or contract with one another to provide any function, service, or facility lawfully authorized to each of the cooperating or contracting units, including the sharing of costs, the imposition of taxes, or the incurring of debt, only if such cooperation or contracts are authorized by each party thereto with the approval of its legislative body or other authority having the power to so approve." Section 29-1-203(1), C.R.S. (1986 Repl.Vol. 12A)

DTI argues that the constitutional and statutory phrase "lawfully authorized to each" means that each contracting entity must be fully authorized to perform the subject activity. Essentially, DTI is arguing that this phrase means that the City can only contract with the County to perform those functions which the City could lawfully perform alone. Thus, according to DTI, although the City can operate a transit system within its own boundaries without PUC authority, pursuant to *City & County of Denver v. Public Utilities Commission*, 181 Colo. 38, 507 P.2d 871 (1973), it cannot operate beyond these boundaries and into the County without PUC authority. Therefore, it asserts that any agreement between the City and County which allows the City to operate in such a manner is invalid.

Defendants, however, contend that this phrase means only that each contracting entity must be lawfully authorized to perform the subject activity within its respective jurisdiction. Thus, according to defendants, since both the City and County are authorized to operate mass transit systems within their respective boundaries, the activity is "lawfully authorized to each" and the agreement is valid.

In our view, the phrase "lawfully authorized to each" is susceptible to either interpretation and, thus, is ambiguous. Therefore, to determine the meaning of this phrase, we must look to the statute as a whole and construe it in light of the legisla-

tive purpose it was designed to accomplish. *Parfrey v. Allstate Insurance Co.*, 815 P.2d 959 (Colo.App.1991).

In addition, in determining the meaning of this phrase, effect must be given to other related statutory provisions, *see Buck v. District Court*, 199 Colo. 344, 608 P.2d 350 (1980), as well as to pre-existing case law on the subject. *See People v. Green*, 734 P.2d 616 (Colo.1987).

The legislative declaration to the enabling intergovernmental agreements statute provides that the purpose of this statute is:

"[To permit and encourage] governments to make the most efficient and effective use of their powers and responsibilities by cooperating and contracting with other governments, and to this end this [statute] shall be liberally construed." Section 29-1-201, C.R.S. (1986 Repl.Vol. 12A)

■ In addition, counties have not only the powers which are expressly conferred on them, but also such incidental implied powers "as are reasonably necessary to carry out powers expressly conferred." *Adams County Golf, Inc. v. Colorado Department of Revenue*, 199 Colo. 423, 610 P.2d 97 (1980); *Farnik v. Board of County Commissioners*, 139 Colo. 481, 341 P.2d 467 (1959).

■ Similarly, cities also have "such implied and incidental powers, authority, and privileges as may be reasonably necessary, proper, convenient, or useful" to carry out the powers and authority granted to them. Section 31-15-101(2), C.R.S. (1986 Repl.Vol. 12B); *see also* Colo. Const. art. XX, § 6.

In our view, this law demonstrates that cooperation between governmental entities through intergovernmental agreements should be encouraged and that the contracting entities should be deemed to possess the powers necessary to effectuate such agreements.

If the interpretation urged by DTI were adopted, then intergovernmental agreements could be made only when both entities had pre-existing functional and territorial authority to engage in the subject ac-

tivity. Such an interpretation would place significant limits on the type of allowable intergovernmental agreements because at least one of the contracting entities would have to have pre-existing authority to operate outside its jurisdictional boundaries. In addition, if this interpretation were accepted, it would appear there would be no need for the constitutional or statutory provisions authorizing intergovernmental cooperation since at least one of the entities could perform the subject activity without the cooperation of the other.

 ■ In our view, to adopt this interpretation would not encourage governments to make the most efficient and effective use of their powers by cooperating and contracting with other governments as intended by the General Assembly. *See* § 29–1–201. Rather, we conclude it is more in accord with the statutory scheme to construe the phrase "lawfully authorized to each" to mean only that each entity must have the authority to perform the subject activity within its jurisdictional boundaries.

This interpretation also is consistent with other jurisdictions which have considered this issue. In discussing a statute governing intergovernmental agreements similar to the one in this case, the California Supreme Court, in *City of Oakland v. Williams*, 15 Cal.2d 542, 103 P.2d 168 (1940), rejected an interpretation similar to the one urged by DTI here. In that case, seven contiguous municipalities made an agreement to solve a sewage effluent problem common to all of them. The auditor of the City of Oakland challenged this agreement, claiming that it was invalid under the California intergovernmental agreement statute which provided that municipalities may enter into agreements authorized by their legislative bodies to "jointly exercise *any power or powers common to the several contracting parties.*" *City of Oakland v. Williams, supra* (emphasis added).

The California Supreme Court disposed of the auditor's argument as follows:

"In substance, [the auditor] urges that the statute above referred to authorizing the joint exercise by municipalities of powers 'common' to them does not con-

template or permit the joint exercise of powers that may be separately or independently exercised by them, but only permits of the joint exercise of powers already possessed in common. *Such a construction of the statute is strained and would render it meaningless. In other words, if municipalities possessed a power in common there would be no need for a statute authorizing their joint exercise.* The statute means nothing if it does not mean that cities may contract in effect to delegate to one of their number the exercise of a power or the performance of an act in behalf of all of them, and which each independently could have exercised or performed." (emphasis added)

*See also School District v. Kansas City*, 382 S.W.2d 688 (Mo.1964) (intergovernmental agreement authorizing a school district to erect and operate library on city land is valid); *Kaufman v. Swift County*, 225 Minn. 169, 30 N.W.2d 34 (1947) (county and city may jointly erect hospital within city limits pursuant to intergovernmental agreement because each individual entity has power to do so, and thus, the "authority of two governmental units ... is common to both"); *Kentucky–Indiana Municipal Power Ass'n v. Public Service*, 181 Ind.App. 639, 393 N.E.2d 776 (1979) (six cities from two different states may form intergovernmental agreement to develop and implement bulk power supply program).

 ■ DTI asserts, however, that such an interpretation would allow a governmental entity to expand its authority by "sharing" the authority of another governmental entity. And, DTI argues, the only agency which can authorize the City to operate a mass transit system is the PUC. Therefore, according to DTI, by authorizing the City to operate beyond its jurisdictional limits in an intergovernmental agreement, the County has "usurped the PUC's exclusive jurisdiction to regulate transportation."

We agree with DTI that such an interpretation appears to infringe on authority the PUC would otherwise have when a city

operates outside its boundaries. Therefore, we must also review the relevant constitutional and statutory schemes regarding PUC authority to determine whether this interpretation is also consistent with their underlying purpose. *See People v. T.O.*, 696 P.2d 811 (Colo.1985).

Colo. Const. art. XXV provides that "[u]ntil such time as to the General Assembly may otherwise designate, [the powers to regulate public utilities] shall be vested in the Public Utilities Commission." The purpose of this article "was to grant to the General Assembly the authority to regulate privately owned public utilities *within* home rule cities." *Denver v. Public Utilities Commission*, 181 Colo. 38, 507 P.2d 871 (1973) (emphasis in original).

This article, however, specifically provides that it shall not be construed to apply to municipally owned utilities. The rationale behind the constitutional exemption of municipally owned public utilities from regulation by the PUC was discussed in *Town of Holyoke v. Smith*, 75 Colo. 286, 226 P. 158 (1924). There, the supreme court stated the following:

"On principle it would seem entirely unnecessary to give a commission authority to regulate the rates of a municipally owned utility. The only parties to be affected by the rates are the municipality and its citizens, and, since the municipal government is chosen by the people, they need no protection by an outside body. If the rates for electric light or power are not satisfactory to a majority of the citizens, they can easily effect a change, either at a regular election, or by the exercise of the right of recall."

However, as examined in *Denver v. Public Utilities Commission, supra,* if the City is serving citizens outside its jurisdictional boundaries, these citizens would not have power to control the municipality and cannot "easily effect a change, either at a regular election, or by the exercise of the right of recall." Therefore, in order to protect these citizens, the PUC has authority to regulate such extra-territorial activity.

As opposed to that situation, however, here there are two governmental entities which control the terms of the service provided to the citizens. And, just like the citizens in the City, the citizens of the County here do "have the power to effect change in the governing board responsible for the quality of service provided by a county owned mass transit system operating within county boundaries." *City of Durango v. Durango Transportation, Inc., supra.*

Thus, since each respective group of citizenry in the City and County can effect change through the electoral process, it follows that if they are dissatisfied with an intergovernmental contract entered into by their responsible governing boards, they can also exercise their rights by recalling the elected officers who approved the contracts.

Thus, there is no need for PUC oversight here since the contracting boards are directly responsible to their respective electorate. Recognition of the intent that these agreements be subject to the control of the citizenry is also evinced by the intergovernmental agreement statute which provides that such agreements may be entered into "only if [they] are authorized by each party thereto with the approval of its legislative body or other authority having the power to so approve." Section 29–1–203(1), C.R.S. (1986 Repl.Vol. 12A).

Therefore, we conclude that allowing the City and County to "share" their respective authorities in an intergovernmental agreement so as to allow the City to operate a transit system in the County without PUC authority is not inconsistent with the purposes underlying the PUC regulations. *See School District v. Kansas City, supra* (The constitutional provision regarding intergovernmental agreements and the statutes implementing it "expressly authorize a cooperative effort which in its very nature denotes a division or sharing of that which is necessary to achieve the common end.").

Accordingly, because intergovernmental agreements are encouraged and because it is consistent with the regulatory purposes underlying PUC authority, we conclude

that, pursuant to § 29–1–201, et seq., the City and County here may lawfully contract to share their authority to operate mass transit systems and allow the City to operate such a system in the County without PUC authority.

## II.

█ DTI also contends that the intergovernmental agreement is invalid because there is not equal participation between the City and County in operating the transit system. Specifically, DTI argues that the City is solely responsible for the management and operation of the transit system whereas the County has no role in its operation, nor does it assume any liability with respect to the system. Thus, DTI argues, "all the County did was give the City the authority to operate a bus system in the county without PUC authority," and such an attempt to circumvent the PUC's authority should not be validated as a "true" intergovernmental agreement. We disagree.

The statute governing intergovernmental agreements provides that "[a]ny such contract shall set forth fully the purposes, powers, rights, obligations, and the responsibilities, financial and otherwise, of the contracting parties." Section 29–1–203(2), C.R.S. (1986 Repl.Vol. 12A).

In our view, this statute is plain and unambiguous, and therefore, "our inquiry need go no further." *Kane v. Town of Estes Park*, 786 P.2d 412 (Colo.1990).

There is absolutely nothing in this statute which indicates that financial or management participation is required of each of the contracting entities. In addition, DTI has not cited any authority for its position that an arrangement, such as the one here, invalidates an intergovernmental agreement. Therefore, the fact that the County, by its own admission, was not in a financial position to contribute to the operation of the system or to incur any potential liability from its operation does not in any way impair or erode the contractual arrangement.

To the contrary, the "lead agency" concept in intergovernmental agreements, whereby one of the contracting entities is empowered to perform a function for the other contracting parties, has been endorsed by other jurisdictions which also have considered this issue. As previously discussed, *City of Oakland v. Williams, supra*, involved an intergovernmental agreement between seven municipalities. Pursuant to this agreement, one of the cities, the City of Berkeley, was solely responsible for performing the subject activity.

In inferentially validating this "lead agency" role, the California Supreme Court held that:

"In so legislating the Legislature recognizes that there are certain situations and problems that can best be met and solved by several governmental agencies acting jointly and permitting one of their number to act for all."

*See also School District v. Kansas City, supra* (agreement which provides that district will erect, maintain, and operate library on city land without cost or charge to city is valid).

Here, the trial court found, and DTI does not dispute, that the City and County "have reduced their agreement to writing; have spelled out the duties and responsibilities of each; and have been authorized to contract by the legislative bodies of the respective entities." Therefore, the trial court determined that the agreement comports with the requirements of the statute and is valid, and we agree.

Finally, DTI contends that the intergovernmental agreement here is invalid because the transit operation is "a proprietary, rather than a governmental function." This contention, however, was raised for the first time in DTI's reply brief. Since this issue was not presented to the trial court, we will not consider it on appeal. *See People v. Czemerynski*, 786 P.2d 1100 (Colo.1990).

Judgment affirmed.

STERNBERG, C.J., and SMITH, J., concur.